JFP:pac 95326 \pleading\95326LopardoStateFacts.wpd

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| ROSELINE CHOLOPY, In Her Individual Capacity and as Administratrix of the Estate of ERIC A. KROMAH | ) | |
| VS. | ) | C.A. NO. 03-284L |
| CITY OF PROVIDENCE, ET AL | ) | |

**DEFENDANT, KENNETH LOPARDO'S, STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 12.1**

*The defendant, Kenneth Lopardo, the moving party with respect to his motion for summary judgment, files the following concise statement of material facts to which he contends there is no genuine issue necessary to be litigated.*

Reference Codes:
EK — Edwin Kemble's Deposition (9/8/05)
KL — Kenneth Lopardo's Deposition (9/8/05)
VP — Vincent Pazzetta's Affidavit
MI — Michael Imondi's Deposition (9/8/05)

1. The incident in question took place on July 28, 2000 at approximately 11:22 p.m. [EK @ 50-51]

2. The Providence Police Department dispatcher received a call that a person was trying to get into a window at the rear of the home located at 101 River Avenue, Providence, Rhode Island.

3. The Providence Police Department dispatcher put out a call that there was a break in progress at 101 River Avenue, Providence, Rhode Island. [EK @ 52]

4. That home was owned and occupied by Emma Cervona who was 58 years old at the time. [EK @ 89; KL @ 73]

5. Living with Ms. Cervona at the time was her mother who was in her "late 70s, 80s." [EK @ 89]

6. Officers Edwin Kemble ("Kemble") and Vincent Pazzetta ("Pazzetta") arrived in front of the property at 101 River Avenue within seconds of each other. [EK @ 55; VP @ 3 and 4]

7. As Kemble and Pazzetta walked along the side of the house, they heard glass breaking in the rear of the house. [EK @ 58; VP @ 5]

8. Kemble continued along the route he and Pazzetta had been walking and jumped over a fence into the back yard. [EK @ 60]

9. Pazzetta stopped and went in the opposite direction around the other side of the house so as to ensure that the perpetrator would not escape. [EK @ 56 and 60; VP @ 7]

10. After jumping the fence, Kemble immediately confronted Eric Kromah ("Kromah") who was standing on a bulkhead trying to gain entrance into the house by way of a window that had been smashed. [EK @ 57 and 61]

11. Kemble ordered Kromah away from the house and directed him to show his hands. [EK @ 63-64]

12. Kromah turned around with his hands in front of him. [EK @ 65]

13. Kromah approached Kemble. [EK @ 65]

14. Kemble then grabbed Kromah by his arm. [EK @ 64]

15. Kromah resisted and broke free for a second. [EK @ 67]

16. Kemble grabbed him again and brought him to the ground. [EK @ 67]

17. Pazzetta—who had gone around the entire house—finally arrived at the back yard and observed the struggle between Kemble and Kromah. [VP @ 8]

18. Pazzetta came to Kemble's assistance. [EK @ 70; VP @ 9]

19. Just as Pazzetta was entering the fray, Kemble, who was having a difficult time controlling Kromah, pulled out his department-issued pepper spray. [EK @ 67 and 72]

20. Kemble directed a short burst (one to two seconds) of the pepper spray towards Kromah's face. [EK @ 72 and 73; VP @ 10]

21. Kemble and Pazzetta were then able to gain control of Kromah, and he was handcuffed behind his back. [EK @ 71; VP @ 10]

22. Kemble inquired of Kromah as to whether he had an accomplice. [EK @ 70 and75; VP @ 11]

23. Kromah indicated that he "had a friend in the house". [EK @ 70 and 73; VP @ 11]

24. Pazzetta requested that a K-9 unit respond to the scene so as to "flush out" any other suspects that might still be in the home. [EK @ 76-77; VP @ 12]

25. Kemble and Pazzetta then assisted Kromah to his feet so that he could be escorted to Pazzetta's police vehicle which was parked in front of the house. [EK @ 79; VP @ 14]

26. As Kromah and the officers proceeded down a walkway adjacent to the home, Kromah indicated that he could not walk any further and sat down on the walkway. [EK @ 80-81; VP @ 15]

27. Kemble and Pazzetta felt that Kromah may have been suffering from the effects of the pepper spray, so they allowed him to rest for a few seconds. [EK @ 85-86; VP @ 16]

28. **It was at this moment that the defendant, Sergeant Kenneth Lopardo, arrived at the scene.** [VP @ 17; KL @ 43-44]

29. Lopardo observed Kromah sitting on the ground on the walkway next to the house. [KL @ 44-45]

30. Lopardo was informed by Pazzetta that Kromah had indicated that he had a friend in the house. [KL @ 45]

31. Lopardo directed other officers who had arrived at the scene to surround the house so that the perimeter was secure until the K-9 arrived. [KL @ 45-48]

32. While waiting for the K-9 unit, Kromah was told several times to get up which he refused to do. [KL @ 48-49]

33. Finally, Kromah indicated to Lopardo that if he (Lopardo) would assist him, he would go to the car without any trouble. [KL @ 48-49]

34. Lopardo helped him up and he began to escort Kromah towards Pazzetta's car. [KL @ 52 ; VP @ 21]

35. When they got to the car, Kromah was placed in the rear seat of Pazzetta's police vehicle. [EK @ 91-94; VP @ 21; KL @ 52-58]

36. Patrolman Al DeChristofano, the K-9 officer on duty, arrived at the house and searched the interior of the house with his dog. [VP @ 22]

37. No one was found in the house. [KL @ 60]

38. To ensure that no one was in the house and because two elderly women lived there, Lopardo directed another search of the house which he, Pazzetta and another patrol officer (Patrolman Michael Imondi) conducted. [KL @ 61; MI @ 27-28; VP @ 23]

39. Once again, the search proved to be negative.

40. As they were leaving the house, Pazzetta advised Lopardo that he would be taking Kromah to the hospital for treatment to the injuries he had sustained to his hands and arms as a result of being cut by the broken glass of the window. [VP @ 24; KL @ 66]

41. Pazzetta got into his police vehicle and drove to the Roger Williams Hospital which was less than one-half of a mile from the address at 101 River Avenue. [VP @ 25]

42. Upon his arrival at the hospital, Pazzetta noticed that Kromah was non-responsive. [VP @ 26 and 27]

43. Pazzetta immediately ran into the emergency room and obtained a gurney. [VP @ 28]

44. Pazzetta and Patrolman O (who had followed Pazzetta's police vehicle to the hospital as part of standard operating procedures) put Kromah on the gurney and rushed him into the emergency room where hospital personnel took over. [VP @ 29 and 30]

DEFENDANT, Kenneth Lopardo
By his Attorney,

Joseph F. Penza, Jr., Esq. #0607
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 9/28/05 to:

Kevin F. McHugh, Esq.
CITY SOLICITOR'S OFFICE
275 Westminster Street, Suite 200
Providence, RI 02903-1845

Joseph Moniz, Esq.
Moniz, Cooper & McCann, LLP
100 Allyn Street
Hartford, CT 06103

Alton Wiley, Jr., Esq.
Local Associate Counsel
960 Reservoir Avenue, Suite 22
Cranston, RI 02910

# KEMBLE DEPO

95329





UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROSELINE CHOLOPY, in her individual capacity as Administratrix of the Estate of ERIC A. KROMAH

vs. C.A. No. 03-284L

CITY OF PROVIDENCE; POLICE DEPARTMENT OF THE CITY OF PROVIDENCE; URBANO PRIGNANO, JR., individually and in his official capacity as Chief of Police of the City of Providence; SERGEANT LOPARDO, individually and in his official capacity; and JOHN AND JANE DOES 1-10, Supervisors and/or Employees of the City

DEPOSITION OF OFFICER EDWIN J. KEMBLE, JR., a Witness in the above-entitled case, taken on behalf of the Plaintiff, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Olenn & Penza, LLP, 530 Greenwich Avenue, Warwick, Rhode Island on September 8, 2005 at 11:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF......LAW OFFICE OF JOSEPH MONIZ
BY: JOSEPH MONIZ, EQUIRE
100 ALLYN STREET
HARTFORD, CT 06103

FOR THE DEFENDANTS.....OLENN & PENZA, LLP
BY: JOSEPH F. PENZA, JR., ESQ
530 GREENWICH AVENUE
WARWICK, RI 02886

ALSO PRESENT: Alton Wiley, Esquire, Roseline Cholopy
Kenneth Lopardo

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

statements?
A. Right.
Q. Are there any other kinds of reporting information, aside from a witness statement and the uniform report?
A. No. Seizure of property form, but there was no seizure of any property or anything.
Q. Would there be other kinds of forms filled out?
A. No.
Q. Would there be any report of if the person had gone to the station and were processed, I take it you would have more information as a result of the processing?
A. There would be a processing sheet and lock-up sheet on the prisoner.
Q. Okay. I want to direct your attention now to the incident in question on July 28, 2000. You indicated you were working overtime?
A. I believe I was.
Q. What shift were you working, if you remember, during that day?
A. 11:00 to 7:00 in the morning shift.
Q. 11:00 P.M. to 7:00 A.M.?
A. Yes.
Q. Had you -- when you say overtime --



A. I'm assuming I was at work at 7:00 that night, came in four hours before my shift started.
Q. Why do you assume that?
A. The district I was working had something to do with that. I probably was -- there was a lot of overtime going on.
Q. Why was that?
A. I don't know.
Q. There's nothing in your report that would indicate your shift, is there, or in your statement, rather?
A. It contains 2322 hours, would be after 11:00.
Q. The incident occurred -- was reported initially at 11:22?
A. I don't know if I was working before that shift or not. I was working a lot, I know that.
Q. You said earlier without my asking you that you were working overtime that night?
A. Right.
Q. Your normal shift would have been 11 to 7?
A. Yes.
Q. This occurred 22 minutes after 11. If you were working your regular shift, it would have still occurred on your shift?
A. Yes.



Q. Yet, you stated, without being asked, that you were working overtime. I'm trying to determine what it is that you base that statement on?
A. One is I remember a lot of people were working overtime, and I have to check the records.
Q. There are records that would indicate?
A. Yeah. I'm under the assumption I was working overtime that shift, the shift before that.
Q. When you said you think you came on at 7:00 P.M., would that be based on what you would normally do if you were working overtime?
A. Yes, for that shift, yes.
Q. Where were you when you heard the call come in?
A. I can't recall exactly.
Q. When you say in your report at 7:28 at 2322 you responded to 101 River Avenue to back up cars 323 and 327 for a break. Where do you get the information to put in the report?
A. Those are the post cars in that district.
Q. Do you know whose cars those two, 323 and 327 were?
A. I couldn't tell you.
Q. But those would be the post cars there?
A. Correct.
Q. I take it from your report that you hear over your



radio this report of a break in progress?
A. Yes.
Q. What causes you to respond to that, is there any procedure you would know that you should respond to it or not respond to it?
A. You have to respond to it.
Q. Why do you have to respond to it?
A. It's an emergency call.
Q. Does it depend on where you are located physically at the time?
A. If I'm on the other side of the city, if I'm miles away, it wouldn't be feasible for me to respond.
Q. I take it depends on where you are relative to the incident?
A. If you're in the district, you will respond.
Q. Are you familiar with the River Avenue area?
A. Yes.
Q. It indicates in your report that you responded and was met by Officer Pazzetta, car 327. I take it from that part of it that Officer Pazzetta was operating car 327?
A. Okay.
Q. Is that within that district?
A. Yes.

Q. Would the number indicate to you that 327 is assigned to that district?
A. To that post, no. That would be the boundary car. That would be the next post over from that.
Q. Does it go by the number of the car itself?
A. These are old districts. What do you mean by the car itself?
Q. You said when I read to you 323 and 327, you say those were post vehicles?
A. Right.
Q. Is the number designated by the location of the car?
A. Yes.
Q. Or is there a number physically on the car?
A. No. It's just designated as the car. There is no number on the car.
Q. So, that would tell you the 323 and 327 were either in the district or boundary to the district?
A. I would know, okay, 26 car, the old cars 26, 27, 23, 21, 22, those cars would work that district.
Q. What did you observe when you got to 101 River Avenue?
A. Officer Pazzetta getting out of his vehicle,



both of us facing the dwelling.
Q. Did you -- when you got there, was Officer Pazzetta already there?
A. We arrived at approximately the same time.
Q. What could you see as you got there when you got out of your car?
A. Two-family home.
Q. And you had received information that there was a break in progress?
A. Yes.
Q. Was that the only information you had?
A. As I recall, yeah, I can't remember any other --
(INTERRUPTION)
Q. When you got to the house and you saw the two family house, did you see any suspect when you first got there?
A. Not when we first got there, no.
(ALTON WILEY ENTERED AT THIS POINT)
Q. Did you hear anything when you first got there?
A. No, I don't recall.
Q. How long after you heard the radio reporting a break in progress did you arrive at the River Avenue address, approximately?
A. Two minutes.



Q. Do you remember where you came from?
A. I think I was coming up Valley Street.
Q. So about two minutes elapsed between the time that you heard the call of a break in progress and the time you got to the scene?
A. When I say two minutes, it's --
Q. It's an estimate, I know.
A. It could be one minute, one to two minutes.
Q. Okay. I guess what I mean, you weren't right at the scene when the call came in?
A. No.
Q. You had to drive up Valley Street?
A. Yes.
Q. And from Valley, how would you get to River?
A. I don't know where I was at that time exactly. I would go by to River.
Q. Does Valley run into River?
A. Valley to River.
Q. What happened when you got there, just describe to me what happened?
A. I was met by Officer Pazzetta, at which time we went -- he went to one side of the house, I went to the other side of the house to go to the rear.
Q. Did you know -- when you said you went to one side



and Pazzetta went to the other side, if there was someone in the rear of the house?
A. No.
Q. You didn't know if anyone was even out there, other than the information you received about a break-in?
A. I vaguely remember the call as someone is trying to get into the house.
Q. When the call came in, do you remember whether they indicated whether it was a male?
A. No, I don't recall.
Q. Do you recall whether they indicated the race of the person with the information?
A. I don't recall.
Q. So what happened next?
A. I entered the back of the house first. I got there first, at which time I saw a person on a bulkhead halfway into the home, top of his body was into the home.
Q. How was he getting into the home?
A. He was on top of the bulkhead.
Q. When you said halfway --
A. There was a window.
Q. What kind of window?
A. I can't recall what kind of window.

Q. What was the condition of the window?
A. I know it was broken.
Q. And as a matter of fact, you indicate that you heard glass breaking, correct?
A. There is a possibility, yes. It's been so long.
Q. Look at your report, Exhibit 1, on Line 3 you say there, "Both Patrolman Pazzetta and I then walked along" --
A. Now I recall, yes.
Q. Let me finish.
MR. PENZA: Let him finish the question.
Q. "Both Patrolman Pazzetta and I then walked along the northwest side of 101 River when we both heard glass breaking from the rear of the dwelling." Is that statement accurate?
A. Yes.
Q. That's the truth?
A. As I recall, yes.
Q. When you say that both Pazzetta and you walked along the northwest side of 101 -- could you do me a favor -- would you just draw, I'm not going to hold you being an artist or anything with respect to the accuracy of it, but just draw the general



layout of 101 River and where the car was, if you could do that.
THE WITNESS: Where the what was?
Q. What the house -- if you would just draw an object for the house and you were when you first got there.
(WITNESS DRAWING DIAGRAM)
MR. MONIZ: No one is going to hold you to be an artist.
THE WITNESS: I am not an artist. Musician but not artist. I'm not sure what was on the other side of the house here but there is a pathway.
Q. Where would River Avenue be?
A. Right in front.
Q. Could you put an R for River.
(COMPLIED)
Q. Where was your car parked relative to the location of the house?
A. Probably over here (indicating).
Q. It's not held to scale, obviously. Do you recall where was Officer Pazzetta's car?
A. Probably somewhere over here (indicating).
Q. Could you put an arrow for what would be north, if you know?



(COMPLIED)
Q. Which side of the house did you go around? By the way, you can look at your report if you need to.
A. I remember going up this side (indicating).
Q. This side would be the right side of the house looking at it from the bottom?
A. I believe Officer Pazzetta jumped the fence to get to the other side.
Q. He went on one side and you went on the other?
A. I'm pretty sure.
Q. Where were you when you heard the window break?
A. On the walkway, right about here, halfway in.
Q. You say in your statement, "We both heard glass breaking." How do you know that Officer Pazzetta heard glass breaking?
A. We both looked at each other when we heard it, it was like, get back there quick.
Q. I take it you would have been in a location where you could see Officer Pazzetta when you heard the glass break?
A. Yes, we were in front of the house.
Q. Then you went around the back?
A. Yes.
Q. When you got there, do you know whether you arrived before Officer Pazzetta to the area where



the person was trying to get?
A. I was there first.
MR. PENZA: Let him finish the question. Stop for a second.
Q. Did you notice when Officer Pazzetta arrived at the scene?
A. Yes.
Q. When you -- I should rephrase that. Did you notice when Officer Pazzetta arrived in the back of the house?
THE WITNESS: Did I notice?
Q. Did you see him come around the other side of the house?
A. I didn't see him because I was too busy trying to grab onto the suspect.
Q. Okay. Tell us now, describe to us what happened when you saw the suspect, you described him as sort of halfway in the window, describe as best you can what you observed with regard to him trying to get in?
A. I saw a male subject, looked like his elbows were already into the house, went up to the bulkhead and pulled him out. As he came out, he turned around and started off the bulkhead, jumped off the bulkhead and started going up the walkway,

taking off, at which time I grabbed him again.
Q. When you say the walkway, you're talking about the walkway you came in on?
A. No. There is a walkway behind the house also.
Q. Could you just mark on the artist's rendition, the walkway in the back of the house?
A. I believe it was a side walkway, some kind of is cement thing.
Q. Just put walkway.
A. It could be a patio, I don't know.
(COMPLIED)
Q. Where was the window located relative to the back of the house?
A. Above the bulkhead.
Q. Was it in the middle of the house, to one side of it?
A. I can't remember.
Q. What kind of bulkhead was it? Let me rephrase that. Was it one of those bulkhead that covers the basement that slants up, goes up on an angle?
A. I believe so.
Q. Was it metal, wood?
A. I don't remember.
Q. But he was standing up on the bulkhead?



A. Halfway in the window.
Q. The window would have been, I take it, above the bulkhead?
A. Yes.
Q. Was the window opened, or was he going in through a broken piece of glass?
A. I don't know. I can't remember. All I remember is pulling him out.
Q. Okay. When you pulled him, where did you grab him?
A. I grabbed him by the back of the shirt, my hands to pull him out.
Q. Before pulling him, did you say anything to him, did you give him any orders about stopping or anything else?
A. I can't recall. I might have. I'm not sure.
Q. If you look at your report, you state that I then confronted a black male subject later identified as Eric Kromah. I take it when you say confronted -- tell me what you mean by confronted.
A. Approached.
Q. You say he was standing on the bulkhead trying to gain access to the house; what do you mean by that?
A. Standing on the bulkhead trying to gain



access to the house, what do I mean? He was attempting to get into the house.
Q. You don't say in your report, though, anything about him being halfway in the window, correct?
A. No.
Q. You also then say in your report, I then yelled at the subject, "Let me see your hands"; to which the subject turned around. The subject then began to come toward me. I then grabbed him by the arm.
A. That's it, yes.
Q. By your report you don't indicate anything about you pulling him out of the window. Would you agree with that?
A. It's so long ago.
Q. Was the statement that you gave in your report true?
A. I would stand by this statement here.
Q. By this statement, you're talking about the report?
A. Right.
Q. Okay. Looking at your statement now, describe what he did when he turned -- withdraw that. I take it when you yelled at him, "Let me see your hands," that was in order to determine if he had any weapons?



A. Correct.
Q. I assume when you saw him, you first got there, he was facing the house, you didn't know whether or not he had any weapons?
A. Correct.
Q. When he turned around, did you observe any weapons?
A. No.
Q. When he came towards you, just how was it that he came towards you?
A. I don't recall.
Q. But he was coming at you physically?
A. Yeah. He was coming off the bulkhead.
Q. Did you -- had you drawn your gun prior to giving the command to "turn around and show your hands"?
A. No.
Q. Procedurally, would that be something that you would do for your own safety?
MR. PENZA: Objection to form. You can answer.
THE WITNESS: Can I answer?
MR. PENZA: You can answer.
A. Depending on the circumstances.
Q. Under these circumstances where you had a report of a break in progress, you heard glass breaking,

you couldn't see his hands, would your training and experience indicate that you would take your service revolver out?
MR. PENZA: Objection. You can answer.
A. Yes. Depending on the circumstances, if I felt my life was in danger, I would have a firearm out. At that time --
Q. But you didn't know whether or not he had a gun?
A. Right.
Q. You heard glass breaking?
A. Yup.
Q. And you didn't take your service revolver out?
A. I don't recall. I don't think I did.
Q. When he came towards you, did you take your service revolver out, if you remember?
A. No.
Q. As best you remember, you never had it?
A. As best I remember, I never had it out.
Q. When he came towards you, did he say anything?
A. No.
Q. Could you see his face?
A. I can't remember.
Q. Could you tell his race?
A. I can't remember.



Q. About how big was he?
A. About 5'7", somewhere around there.
Q. Do you recall approximately -- I don't mean his weight, was he a big person, small, medium?
A. Medium, not big.
Q. What happened? What happened next?
A. He broke free from me, and I grabbed onto him again.
Q. Just describe -- you said you grabbed his arm, which arm, if you remember?
A. I don't remember.
Q. Why did you grab his arm?
A. Because he was getting away. He was taking off.
Q. When you said, "I then grabbed on to the subject again bringing him to the ground," how did you do that?
A. Probably grabbed him with two hands and take him down like that (indicating).
Q. Was he still resisting?
A. Yes. He was trying to get up again.
Q. That's why you used the pepper spray?
A. Correct.
Q. You say here, "At this, I then sprayed the subject with a short burst with my department-issued



pepper spray"?
A. Yes.
Q. And what kind of resistance was he giving you that caused you to use the pepper spray?
A. Resistance.
Q. In what fashion?
A. Getting up, trying to get away.
Q. When he was trying to get up, were you pushing him down before you sprayed him?
A. Yeah.
Q. What kind of pressure did you put on him when you were trying to keep him from taking off?
A. Not much at all, just enough to try to cuff him.
Q. I take it you couldn't cuff him before you sprayed him?
A. Trying to get away.
Q. Sequentially, in terms of how this occurred, when you put him to the ground, did you throw him to the ground?
A. No.
Q. What kind of force did you use to get him to the ground while he was trying to get away?
A. Just enough for him to lose his balance to bring him down.



Q. When you say enough to lose his balance --
A. Taking him off one of his feet, and one of your feet come up, if you got him by the arm, you take him down.
Q. Would you describe it as sort of tackling him?
A. Yeah -- yes and no.
Q. Did he go down face first?
A. He went down not face first, he went down chest first, on his knees first, yeah.
Q. Were you on top of him when he went down?
A. No.
Q. How were you trying to handcuff him when he went down?
A. How was I trying to handcuff him? I can't recall.
Q. Did you have your cuffs out?
A. I can't recall whether I used my cuffs or Officer Pazzetta.
Q. Before you used the pepper spray on him, how much resistance had he given to you?
MR. PENZA: Objection to form. You can answer.
A. I used enough force to make me reach into my belt and take my pepper spray out to pepper spray him to detain him.

Q. Was he saying anything?
A. I can't recall -- oh, yes, he did. He said, "Somebody is in the house," his friend is in the house.
Q. Do you recall that being after he was handcuffed?
A. I can't remember.
Q. Was he facing you while he was resisting?
A. No.
Q. He was facing down?
A. Yes. He was getting up, trying to get up to leave.
Q. Where was Officer Pazzetta while you were trying to --
A. He was with me. I don't know exactly where he was.
Q. You say in your report, "Patrolman Pazzetta then came to my aid and assisted me in handcuffing the subject." What do you mean when you say he came to your aid?
A. Probably assisted in bringing his arm behind his back so we could get the cuffs on him. One of us did. That's what aid is, when you can detain the suspect and force one of the arms to the other arm to cuff him.
Q. You say, "He assisted me in handcuffing." But



when you said he came to your aid --
A. To help me detain the suspect.
Q. You don't recall whether it was you or he who handcuffed him; is that correct?
A. I can't recall.
Q. Okay. Was he -- withdraw that. How was he handcuffed?
A. Behind his back.
Q. Is that the standard procedure, to cuff them behind his back?
A. Yes.
Q. Is there a particular reason for cuffing persons behind their back?
A. For their safety and our safety.
Q. That's a standard procedure?
A. Standard procedure.
Q. Was he cuffed before he was off the ground?
A. Yes.
Q. I take it that in order to handcuff him behind his back, he would have been face down with his hands and you behind his back while he lie there?
A. Yes.
Q. Where was Officer Pazzetta with respect to you when this was done, if you remember?
A. I don't recall.



Q. Do you remember whether he was standing or was he kneeling?
A. I really don't know.
Q. Was any other officer there in the immediate area while you were cuffing him?
A. I don't recall.
Q. It appears from the sequence of your report, I'm going back up to the line that says, "The subject then tried to break free." Do you see that? "I then grabbed on to the subject to bring him to the ground." At some point after he resisted you said you used the pepper spray with a short burst?
A. Yup.
Q. Earlier in the deposition you indicated that you did not make a direct hit. Can you explain that?
A. I can remember seeing the orange on his face and it was not much at all compared to regular procedure.
Q. What was his reaction to the spray?
MR. PENZA: Objection to form. You can answer.
A. Not bad.
Q. What do you mean by that?
A. Well, usually you will hear them, ooh, ooh, ahh, oh, oh, you will hear something verbal. He



complied with his arms, then he put his hands behind his back.
Q. Up until this point where you are handcuffing him, had he said anything at all?
A. I can't recall.
Q. At some point he said there was somebody in the house?
A. Yes, I do remember.
Q. Prior to him saying that, had he, to your recollection, said anything?
A. I don't recall.
Q. Just describe for us just how it was that you reached for your pepper spray and used it, which arm you used and what were you doing with the other arm?
A. I used my right arm, my right hand.
Q. Did you aim it toward his face?
A. Yeah, but his face wasn't exposed to us fully. So, that's probably why I didn't get the direct hit.
Q. That's why you didn't get the direct hit?
A. Probably.
Q. He was facing down at the time?
A. His body was facing down.
Q. After he was cuffed you said you asked him if

Page 74

anyone was in the -- anyone was with him, rather. He stated his friend was in the house. I know it's a couple of years ago.
A. It's four years ago.
Q. Five years ago. As best you recall, indicate the words that he used and the tone of his voice?
A. I can't recall. I really can't.
Q. Was he -- were his words audible, you could hear him?
A. Yeah.
Q. You understood what he was saying?
A. Yeah. His concern was his friend was in the house. I can remember -- it was a big concern to him, I don't know why.
Q. But you could detect it was a concern to him regarding his friend being in the house?
A. He wanted to let us know.
Q. Did he say anything about what his friend was doing in the house?
A. No.
Q. What did you take it to mean when he said his friend was in the house?
A. There was another suspect in the house involved in this break.
Q. You didn't take it to mean that there was someone

Page 75

else that he knew that lived in the house, I take it?
A. No. Broken window.
Q. Did you, in your experience, find it unusual that he said his friend was in the house, he showed concern over it?
A. No.
Q. Why?
A. I've been to numerous calls like that where someone would say my friend is in the house or if that wasn't said, we would ask, anybody else in the house. It would be normal procedure to ask that.
Q. "I then heard a woman's voice coming from the apartment in the rear of 101 stating that an elderly woman lives in the home." What do you remember of that comment by the woman?
A. I don't.
Q. But someone you heard say that? Let me ask you this, do you know whether it was ever determined who said that?
A. No.
Q. You reviewed the investigation --
THE WITNESS: What statement?
Q. Where the report says at the same time -- "I heard

Page 76

a woman's voice coming from an apartment in the rear of 101 stating that an elderly woman lives in the home." Do you know whether it was ever determined who it was that made that statement? Who the woman was?
MR. PENZA: The one who made the statement?
MR. MONIZ: Right.
A. No.
Q. Based upon your review of the documents in this case a couple of weeks ago and earlier on, did you ever see anything that indicated to you that it was determined who this woman was?
A. I think there was a daughter involved, there was two ladies living in this house or something, an elderly lady and a daughter. I just don't --
Q. Do you know personally whether any investigation done by the Providence Police Department determined who it was that made that statement, the woman who made the statement?
A. I don't know.
Q. You don't know?
A. No.
Q. You say at the same time Patrolman Pazzetta came over the airway and stated to the dispatcher the

Page 77

subject was apprehended and another subject may be in the house, requested K-9 unit to respond. What do you mean he came over the airway?
A. He let the dispatcher know, and any other cars that would probably be responding, that a suspect has been apprehended.
Q. As I read it, it sounds almost like you're saying you heard him over the air making that statement?
A. I heard him right there. He's there saying it.
Q. So he radioed that in?
A. Yes.
Q. Did he have a --
A. Yes.
Q. -- radio on his shoulder?
A. Yes.
Q. Is that radio voice-activated, or do you have to do something to make it work to go on?
A. You have to make it work to go on.
Q. So he radioed through the radio on his uniform?
A. Yes.
Q. Could you hear it over the radio itself, separate and apart from him saying it because he was there?
A. I heard it on my radio.
Q. So that would come over the radios of all the

officers in the area as well as the dispatcher?
A. Yes.
Q. You then say, I then observed that the subject had several cuts on his arms and bleeding apparently from the glass breakage. What kind of cuts did you observe that he had?
A. I believe some finger cuts and cuts on his arms.
Q. Finger cuts, you mean his fingers were cut?
A. I don't know. Because of the blood from his arms, it might have gone all over his fingers, I don't know.
Q. Did you -- withdraw that. When you say you observed cuts on his arms --
A. I observed blood on his arms basically.
Q. I assume you could observe his arms, meaning that there was no clothing covering his arms?
A. I don't know. I'm talking about the area of the wrists, the wrist area.
Q. Do you remember whether or not he had on a short-sleeve shirt?
A. I don't recall.
Q. You don't recall whether or not he had a shirt with sleeves?
(PAUSE)



Q. You have to state your answer for the record?
A. No.
Q. As you sit here now, do you remember what amount of blood you observed?
A. No.
Q. I assume you didn't observe any cuts or blood prior to this time; is that correct?
THE WITNESS: Prior to the time?
Q. You say, "I then observed the subject had several cuts"?
A. Yes.
Q. I take it from that --
A. Probably after he was handcuffed --
Q. I take it from that report that you did not observe anything before that?
A. Correct.
Q. You then you go on to say that you and Patrolman Pazzetta escorted the subject around the home to place him in a cruiser. At the time you were doing that, was there any -- did you know which cruiser he was going to be placed into?
A. No.
Q. Would there be any procedure for whether it would be your cruiser, Patrolman Pazzetta's, or other cruisers he be placed into?



A. No.
Q. You say then when Patrolman Pazzetta and I got to the other side of the house, the subject stated he could not walk any further. Do you remember which side of the house you went back around, was it the side you came in on or the side Officer Pazzetta came in on?
A. The side I came in on.
Q. The side with the walk?
A. Yes.
Q. He said he couldn't walk any further. Describe as best you can how he said that.
MR. PENZA: Objection to form. You can answer.
A. "I can't walk."
Q. What was the tone of his voice?
A. Normal.
Q. Was he combative?
A. No.
Q. Before he said that, was he walking -- withdraw that. Where was he when he made that statement?
A. In the middle of the walkway.
Q. Could you just put an X on the house on the drawing rather where it was.
(COMPLIED)



Q. Then if you put underneath there a K for Kromah, indicating where he was when he said that. Was that the location at which he sat down?
A. Yes.
Q. You say the subject then sat down on the sidewalk. Describe physically how he was sitting.
A. Almost in Indian position, one leg tucked under and one leg out.
Q. How did he get to the sitting position, did he do it on his own or did you assist him?
A. We assisted him.
Q. Describe to me the manner in which he walked to that location before saying I can't walk anymore? Withdraw that. Describe to me how he got to that location when he made the statement, "I can't walk anymore"?
A. We were walking him down the walkway, one officer on each side.
Q. Did you have him -- did you have your arm on his arms, or did you have him in your control or --
A. I believe so, yes.
Q. Was he resisting at that point?
A. No.
Q. Was he walking?
A. Yes.

Page 82

Q. Was he able to walk?
A. Yes.
Q. Had he said anything up to -- withdraw that. Did he say anything prior to saying "I can't walk anymore," and after saying, "There is someone in the house"?
A. No.
Q. From what I understand and see in your statement, Mr. Kromah made a comment about his friend being in the house or showed concern about a friend being in the house, then he says, "I can't walk anymore." Do you remember whether he said anything prior to those two statements?
A. No, I don't.
Q. Do you remember if he said anything after those two statements?
A. No, I don't.
Q. Are those the only two statements you recall Mr. Kromah making that evening?
A. Yes.
Q. How far was it that you had to walk him prior to the time that he said, "I can't walk anymore," and he sat down?
A. 15 feet, maybe.
Q. When you say you helped him, describe how it was

Page 83

you helped him to sit?
A. Well, I mean, we're holding him by one arm and we let him sit. We didn't want to let him fall. So we let him sit.
Q. How was he walking when he was walking?
A. I can't recall.
Q. Did he appear to be staggering or anything else?
A. I can't recall.
Q. By the way, in your training for the Providence Police Department, five and a half month course as well as the 12-week course, did you receive training with respect to detaining intoxicated suspects?
A. I don't recall.
Q. Do you recall receiving training in making observations to determine whether someone was intoxicated?
A. Yes.
Q. How much of the training involved that, making observations to determine if someone were intoxicated?
A. It was determined -- well, we had a class on mental health, how to distinguish whether someone was in a medical condition that would be related to intoxication of sorts, how to determine that.

Page 84

Q. Also, as part of your training you would have to make determinations as to whether someone were driving under the influence of drugs or alcohol?
A. Yes.
Q. And there were tests you performed for individuals on the roadside?
A. That would be a whole separate unit. The traffic division would do that.
Q. You received training in doing that?
A. Not necessarily in the academy, no.
Q. Not in the academy?
A. No. They do now.
Q. At that time when you were trained, what were you trained with respect to determining intoxication?
A. Smell of liquor. Basically, if there's a smell of liquor.
Q. You got no training with respect to observing -- making observations, rather, as to someone who was intoxicated, the way they walk, the way they talked, things like that?
A. I can't recall.
Q. Was there a training manual that you used at the time for the training course?
A. There is many, many manuals, yes.
Q. Did you observe anything unusual about Mr. Kromah,

Page 85

aside from the lacerations you saw on his arms?
A. No.
Q. Did you observe anything unusual with respect to the way he walked, the way he talked?
A. No.
Q. Did you observe anything unusual about his eyes?
A. No.
Q. Did you observe any effects of the pepper spray from his eyes?
A. No.
Q. You said, regarding him sitting on the sidewalk, "I let the subject sit to give him some air due to the effects of the pepper spray." What caused you to conclude that he needed to sit because of the effects of pepper spray?
A. The average person would say that I need to get some air subject to pepper spray.
Q. He didn't say that, did he?
A. I can't recall.
Q. In your report you indicate he said, "I can't walk." Is that a fair statement?
A. Probably, if it's written.
Q. Would you take a look so we're not confused on the record. You said here, "I got to the other side of the house and the subject stated he could not

walk any further." Do you see that?
A. Yes.
Q. Is that a true statement?
A. Yes.
Q. And you told me earlier that pepper spray didn't affect the limbs, the arms or legs, do you remember that?
A. Correct.
Q. Was there anything that you observed regarding the pepper spray that would cause Mr. Kromah to not be able to walk?
A. No.
Q. Is there anything in your training or experience in the use of pepper spray that would have an effect on one's ability to walk?
A. No.
Q. So when Mr. Kromah said I can't walk any further and sat down, what caused you to conclude that he was suffering the effects of the pepper spray?
A. By stating he needed air.
Q. Did you indicate in your report that he needed air?
A. He didn't indicate it, but I'm under the assumption that he probably needed to get a breather.



Q. My question, though, is do you say anything in your report that indicated Mr. Kromah stated I need to get air?
A. No.
Q. As a matter of fact, I asked you a little earlier whether he made any statements aside from the two he indicated, one about the friend being in the house and the other about sitting down, and you didn't recall any other statements he made about anything else, correct?
A. Correct.
Q. You then state that you returned to the rear of the building to secure the perimeter. What does that mean?
A. I believe other officers were responding, we needed to secure the perimeter, so whoever was in the house, that we believed someone was in the house would not escape our detection.
Q. The next line indicates car 323 was Patrolman Imondi. So if we look to the report, now we know 323 was Imondi and 327 was Pazzetta?
A. Yes.
Q. You say, Officer Imondi informed you through the neighbor, the occupants were able to escape during the break and were at a neighbor's house?



A. Yes.
Q. Is that something that Patrolman Imondi told you?
A. I believe so, yes.
Q. Did you do any independent investigation to determine whether or not that was accurate?
A. Yes. Afterwards.
Q. What did you determine afterwards and how?
A. Who lived at the house, their names.
Q. Who was that?
A. I can't recall.
Q. Did you review any reports that indicated who lived at the house?
A. Yes.
Q. Where was that?
A. On this uniform report here.
Q. Who lived at the house based on that report?
THE WITNESS: Excuse me?
Q. Who was it that lived at that house based on your observation of this report?
A. An Emma Cervone.
Q. Did you determine whether or not -- based upon your own investigation did you determine whether or not Emma Cervone listed there was the elderly lady that was described earlier?
A. I don't know.



Q. Did you ever speak to Emma Cervone?
A. I believe so.
Q. When did you -- withdraw that. When did you do that?
A. After the incident.
Q. What did she tell you?
A. They were at a neighbor's house.
Q. She told you that?
A. Officer Imondi did, I believe.
Q. I guess my question is did you yourself speak to a person name Emma Cervone?
A. I spoke to two ladies. I don't know their names. It's five years ago. I don't remember their names.
Q. But did you speak to them at the scene?
A. Next door neighbor's house next to the scene, yes.
Q. On the evening in question?
A. Yes.
Q. What did they tell you?
A. Someone was trying to enter, my mother had to run out the front of the house. She was approximately in her late 70s, 80s. That's all I can recall.
Q. Did you take a statement from either of them, the

Page 90

two women you spoke to?
A. I don't recall.
Q. You don't indicate in your report any information you got from there; is that correct?
A. Correct.
Q. Wouldn't that be something important, the statements by the persons who were allegedly in the house?
MR. PENZA: Objection to form. You can answer.
A. No, not necessarily.
Q. Not necessarily?
A. No.
Q. You wouldn't consider that important information regarding this incident?
A. Well, it is but as far as --
Q. Do you remember when you spoke to them?
A. After the scene was secured and we went through the house to make sure nobody else was in it.
Q. At the time you spoke to them, did you know the condition of Mr. Kromah?
A. No.
Q. When did you learn that Mr. Kromah died?
A. Oh, half hour, 40 minutes after.

Page 91

Q. Where were you when you learned that he died?
A. I believe I was in the neighbor's house getting information from the people that lived in the house.
Q. So you were aware of the fact that he died when you did your report, correct?
A. Yes.
Q. Now, you say, "Once the perimeter was secure, I then went to assist Sergeant Lopardo and Patrolman Pazzetta to place the subject in the cruiser." Did you do this before or after you spoke to the two women?
A. Before.
Q. So it was after you assisted the officers in placing Kromah in the cruiser that you spoke to them?
A. Yes.
Q. All right. Describe to me how you placed Mr. Kromah into the cruiser, who did what?
A. I walked to the other side of the cruiser to open the door to get Officer Pazzetta's equipment, I believe he had a duffel bag in the back seat of the car, I removed it. And Sergeant Lopardo and Officer Pazzetta placed him in the vehicle.
Q. Did you observe Mr. Kromah getting up from the

Page 92

position he was sitting in that you described as an Indian position?
A. I was walking ahead of them as they were getting up. I turned to go towards the cruiser to open up the door.
Q. When you left the place where Mr. Kromah was seated, you went to the back and then you came back again?
A. No, I was waiting for them at the car. I walked with them, they got to the car and then I went around the other side of the car to open up the door to get Pazzetta's equipment out.
Q. From your report you say, "The subject then sat down. At this, I let the subject sit to give him some air due to the effects of the pepper spray. I then returned to the rear of the building to secure the perimeter." So it appears from your report as he was sitting, you left to go to the back; do you see that?
A. Yes.
Q. You say that, "Once the perimeter was secure, I then went to assist Sergeant Lopardo and Patrolman Pazzetta to place the subject in the cruiser"?
A. Correct.
Q. My question is when you assisted them, did you

Page 93

come back and see Mr. Kromah still on the sidewalk or had he already gotten up?
A. No. I can remember Sergeant Lopardo and Officer Pazzetta helping him up and walking him.
Q. So you observed that?
A. Yes.
Q. Did they have to help him up?
A. One cannot get up with handcuffs up when they're incapacitated, anyway, it's very difficult, they need assistance.
Q. Was he resisting at that point?
A. No.
Q. When they walked him toward the car, did they have them in their grasps?
A. Yes.
Q. Did he resist getting into the car?
A. No.
Q. How did you place him into the car?
A. I didn't place him in the car. I was on the other side of the car removing the equipment.
Q. What kind of equipment was in the duffel bag?
A. It could be anything.
MR. PENZA: Don't guess. If you don't know, you don't know.
Q. Did they put him in through the back door in the

car?
A. Yes.
Q. Describe as best you can how that occurred.
A. I was busy taking the equipment out. I wasn't even really watching them putting him in. I was taking the equipment out and taking it and putting it -- I can't remember if I put it in the trunk or another car, I don't remember.
Q. Is there a particular procedure for placing an arrested suspect who is handcuffed behind his back into a cruiser?
A. No.
Q. When you were walking to the car, did you observe anything unusual about Mr. Kromah's conduct?
A. No.
Q. Did you hear anything unusual?
A. No.
Q. Did you see him, once he was placed into the car?
A. Did I see him once he was placed in the car, yes.
Q. How was he sitting, lying down or what was he doing?
A. He was sitting.
Q. In what position?
A. Upright.



Q. Do you remember which side of the car he was sitting on?
A. No, I don't.
Q. Was he moving?
A. I don't -- I took my eyes off him after that.
Q. Was he sitting up right?
A. Last time I saw him, he was sitting upright.
Q. Didn't appear to be slouching or lying down?
A. No.
Q. Did you know -- withdraw that. Was there any determination made at that point when Mr. Kromah was placed into the car as to where he was going to be taken?
MR. PENZA: Can I have that question again, please.
(QUESTION READ)
A. At that time we were instructed that we would be securing the house, and I believe at which time Sergeant Lopardo stated transport him to Roger Williams Hospital for the lacerations.
Q. Were you there when that was said?
A. I believe I heard him say, "Transport him to the hospital," yes.
Q. That would have been by Officer Pazzetta?
A. Transporting him, yes.



Q. After you secured the perimeter, then you eventually spoke to the two women, what did you do?
A. I was asked to respond to Roger Williams Hospital.
Q. Approximately what time was that?
A. I can't recall, an hour later.
Q. And do you recall by whom you were asked to respond to Roger Williams Hospital?
A. I can't recall.
Q. Was it over the radio?
A. Yes, I think so.
Q. Were you still at the scene of the break-in when you were called to go to the hospital?
A. I was -- I believe I was at the house, at the other house taking information from the people that lived there.
Q. Who was with you there?
A. I was just there alone.
Q. While you were speaking to them, did anyone else in your presence, any police officers in your presence speak to these two women?
A. I can't recall.
Q. To your knowledge, did anyone else speak to them that night, any other police officers speak to



them that night?
A. I don't know.
Q. Do you know whether or not either of them gave a written statement?
A. I don't know.
Q. What did you -- how did you leave it with the two of them as to what should be done as a follow-up?
A. Basically I took their names and their information, date of birth, phone numbers, all of this is turned over to detectives.
Q. What did you take, did you write on a pad or something?
A. Yes.
Q. Where did that go?
A. I don't recall right now.
Q. Did you turn it over to the detectives?
A. I don't recall.
Q. Was there any other information on the pad or whatever it was you wrote on, aside from the name and other information about them; did you have any notes about what occurred that night?
A. No.
Q. So that would have contained only the names and other information?
A. Just the names and information.

# LOPARDO DEPO

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROSELINE CHOLOPY, in her individual capacity and as Administratrix of the Estate of ERIC A. KROMAH

vs. C.A. No. 03-284L

CITY OF PROVIDENCE; POLICE DEPARTMENT OF THE CITY OF PROVIDENCE; URBANO PRIGNANO, JR., individually and in his official capacity as Chief of Police of the City of Providence; SERGEANT LOPARDO, individually and in his official capacity; and JOHN AND JANE DOES 1-10, Supervisors and/or Employees of the City

DEPOSITION OF DETECTIVE SERGEANT KENNETH J. LOPARDO, a Defendant in the above-entitled case, taken on behalf of the Plaintiff, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Olenn & Penza, 530 Greenwich Avenue, Warwick, Rhode Island on September 8, 2005 at 2:19 P.M.

APPEARANCES:

FOR THE PLAINTIFF......LAW OFFICE OF JOSEPH MONIZ
BY: JOSEPH MONIZ, EQUIRE
100 ALLYN STREET
HARTFORD, CT 06103

FOR THE DEFENDANTS.....OLENN & PENZA, LLP
BY: JOSEPH F. PENZA, JR., ESQ
530 GREENWICH AVENUE
WARWICK, RI 02886

ALSO PRESENT: Roseline Cholopy

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

A. Yes.
Q. Did you type this witness statement, which is Exhibit 3, yourself?
A. Yes.
Q. Where did you do that physically?
A. In the office of the police station.
Q. There appears to be handwriting on the side of Exhibit 3, the left side, do you see that?
A. Yes.
Q. Do you know whose handwriting that is?
A. No idea.
Q. Does it appear to be yours?
A. No.
Q. Is it normal practice to sign the witness statement without a witness signature?
A. When we do it, yes. When we do our statements, yes.
Q. It says statement taken by witness, that's not something that's normally witness, the statement isn't?
A. No. These forms are also used for civilian statements.
Q. Okay. The same form would be used either for a civilian witness or a police officer witness?
A. Yes.



Q. The date that's up there, the date 7-29, that's the date that's consistent with the time the statement is taken 3:05?
A. Yes.
Q. Just tell me as best you recall how you were alerted to this incident on July 28th?
A. A radio call over the police radio broadcast over the police radio.
Q. How was it that -- did you learn how it was that the radio broadcast came over, not physically how, what caused the dispatcher to radio the call out?
A. Apparently, they got a call from somebody.
Q. Now, if you look at your statement, Exhibit 3, that first paragraph there, it appears that you monitored a statement from Officer Pazzetta indicating that he had apprehended a suspect?
A. Yes.
MR. PENZA: Out of the broadcast.
Q. And also that the second subject may be in the house. Would that be something that came over your radio?
A. Yes.
Q. Would it have been your radio in the car?
A. Yes.
Q. You also have radios you wear on your shoulder?



A. Yes.
Q. Would those two broadcasts the same information or would they be different, what comes over the car radio and what comes over your shoulder?
A. If they were on the same channel, it would broadcast the same thing.
Q. It says, "Dispatcher advised the cars on scene to maintain a perimeter and a K-9 was summoned to the scene." It then says, "I proceeded to the scene"?
A. Yes.
Q. What would that indicate to you as to why K-9 was summoned to the scene?
A. Well, because of the belief there was somebody else in the house, and we wanted to search the house with the dog.
Q. Do you remember where you were coming from?
A. I was coming from the North End.
Q. You indicate in the next paragraph that when you got to the scene, you observed the suspect later identified as Eric Kromah on the ground next to the house?
A. Yes.
Q. Now you were here during the earlier depositions where officers described the location. Is that generally consistent with your recollection of



where Mr. Kromah was?
A. Yes.
Q. And that would have been on the south side of the house?
A. Yes.
Q. How close was he to the street when you observed him? You can use Exhibit 6 to indicate.
A. Well, he was halfway up the sidewalk that ran along the house and the yard from the front to the back, generally about approximately halfway up.
Q. Now, you indicate that Officer Pazzetta told you that Mr. Kromah indicated a friend of his was in the house; do you remember that?
A. Yes.
Q. You made sure the perimeter was secure. What did you do to make sure the perimeter was secure?
A. I had the two patrolmen that were there at the scene at the time watch the perimeter of the house.
Q. You indicate here Patrolman O was at the rear and northeast corner of the house and Patrolman Kemble was at the front --
A. Yes.
Q. -- is that correct?
A. Yes.

Page 46

Q. And Patrolman Imondi was at the front also?
A. Right.
Q. Kemble was at the front northwest corner, where would that be?
A. Say that again?
Q. You say Patrolman Kemble was at the front, northwest corner of the house. If you look at Exhibit 6, where would that be? I'm looking at where you say in your statement but I just want you to look at the drawing there. If you would point to the area that would indicate northwest corner?
THE WITNESS: You asked me which patrolman?
Q. In your report -- let me go back. Patrolman O was at the rear, northeast corner of the house?
A. Yes.
Q. I assume that's referring to O was at the northeast corner of the house in the rear. Where would that be?
A. Back here (indicating).
Q. For the record, you're pointing to the corner at the top of the picture closest to the left side of the page, correct?
A. Yes.

Page 47

Q. All right. Then you say Patrolman Kemble was at the front, northwest corner of the house. Where would that be?
A. Here (indicating).
Q. Would you just this pencil and put a circle there and put PK inside of it for Patrolman Kemble.
(COMPLIED)
Q. Maybe you ought to write it above, the circle is small, just put PK.
(COMPLIED)
Q. Patrolman Imondi was at the front southeast corner. And Patrolman Imondi testified to where he was. Where would the southeast corner of the house be?
A. I don't think it's really true northwest the way the house is situated but...
Q. Your report says southeast, would you agree if Officer Kemble was at the front he would have been at the western side of the house?
MR. PENZA: If Patrolman Imondi was in the front, he would be on the west side of the house.
Q. Yes. The southeast would be in the back of the house, would it not?
A. Right.

Page 48

Q. Do you remember as you sit here now where officer Imondi was?
A. I believe he was in the front.
Q. You were on the south side of the house with Kromah?
A. Yes, in the yard.
Q. Who was there with you on the south side of the house?
A. At that point I believe I was alone.
Q. Do you remember where Officer Pazzetta was at that point?
A. No. At one point he was with me. He was still trying to secure the house until K-9 arrived.
Q. What was Mr. Kromah doing?
A. Sitting on the ground.
Q. Did he say anything to you?
A. Yes.
Q. What did he say?
A. At one point he said, "If you help me up, I'll go to the car."
Q. In your report you say, "While I was waiting for the K-9, the subject was told several times to get up" --
A. Right.

Page 49

Q. "Which he wouldn't do." Explain to me what you mean by that.
A. Well, I told him couple of times, get up, because we wanted to put him in the police car, but he wouldn't get up.
Q. Did he say I'm not going to get up?
A. He just wouldn't, just wouldn't get up.
Q. Could he have got up by himself with his hands cuffed behind his back?
A. No, not without assistance.
Q. When you were asking him to get up, were you trying to assist him in getting up?
A. Yes.
Q. Did he refuse to get up?
A. Yeah. He wouldn't -- in other words, he wouldn't try to stand up on his legs.
Q. Did you forcibly pull him to his feet?
A. When he said, "If you help me up, I'll go," I went and helped him stand up.
Q. At some point he says, "If you help me, I'll go"?
A. Yes.
Q. Before you put in your report he refused to get up?
A. Yes.
Q. So you indicate he indicated, "If you help me,

I'll get up"?
A. Yes.
Q. He said that to you?
A. Yes.
Q. What did you observe about his speech?
A. Nothing unusual.
Q. You say in your report you observed his eyes to be bloodshot?
A. Yes.
Q. Describe that as best you can, what you observed.
A. His eyes appeared to be red from the pepper gas.
Q. Why do you assume it's from the pepper gas?
A. Because he had been sprayed.
Q. Did you know that?
A. Yes.
Q. How did you know that?
A. I was told by the patrolman when I got there.
Q. Who told you that?
A. Kemble.
Q. You don't indicate that in your report, though?
A. He's the one that sprayed him.
Q. But there is nothing in your report that indicates that Kemble told you he sprayed him. If you look at the report, prior to the line where you say, I



observed his eyes to be bloodshot and he appeared to be suffering the effects of pepper gas?
A. Right.
Q. But your recollection is that Officer Kemble told you that?
A. Yes.
Q. How do you recall that as you sit here today?
A. I just remember him telling me he sprayed him. It's standard that you would advise the supervisor if you used that force.
Q. But nothing in your report indicates that?
A. Correct.
Q. I take it that you were familiar with the observation you make about bloodshot being caused by the effects of the pepper gas?
A. Say that again, please.
Q. I take it you're familiar with the effects of pepper gas that would cause one's eyes to be bloodshot?
A. Yes.
Q. Did you see any other signs of the pepper gas, aside from the bloodshot eyes?
A. No.
Q. When you say that he appeared to be suffering the effects of pepper gas, what do you mean by that?



A. Well, his eyes appeared to be irritated.
Q. Was there anything else that indicated he appeared to be suffering the effects of pepper gas?
A. Well, again -- no. No.
Q. Would the pepper gas in your experience and training affect your ability to walk?
A. Only to the degree you might not be able to see where you're going.
Q. But it doesn't incapacitate someone's ability to move legs or arms?
A. Not that I've ever observed.
Q. When he said if you help me, he would go to -- did he say, "If you help me, I'll go to the car." You say Kromah told me if I helped him get up, he would go to the car. Did he use those words, "If you help me get up, I'll go to the car," or words to that effect?
A. I think he said something to the effect, "If you help me up, I'll go."
Q. You say then you helped him up and began to bring him to the car and you were assisted by Officers Pazzetta and Kemble?
A. Yes.
Q. At some point in time Officer Kemble must have left the area he was in to come to assist you with



Mr. Kromah?
A. Yes.
Q. Do you remember where Patrolman Pazzetta was when you first got there?
THE WITNESS: When I first got to the scene?
MR. MONIZ: Right.
A. They were both in the area of where the right side meets the rear of the house.
Q. Did Officer Pazzetta leave the area where Mr. Kromah was once you got to the scene and were there next to Mr. Kromah?
A. He left my immediate area for a short time. It was just the three of us there for a period, so we were still trying to do everything at once. So I stood by with the prisoner while they tried to watch the house.
Q. Describe what took place when Mr. Kromah was escorted from the side of the house to the car?
A. I walked to the car.
Q. What do you mean by you walked him to the car?
A. I had him by the arm.
Q. Which arm?
A. His right arm.
Q. How do you remember that?

A. Because I remember being on his right side.
Q. What position were you holding his arm?
A. By the arm.
Q. One hand or two, you using one hand of yours or two?
A. I think one but I'm not sure.
Q. Would that have been your left arm?
A. Yes.
Q. Onto his right arm?
A. Yes.
Q. Where, was anyone else helping him walk?
A. No, I don't believe so.
Q. Was it just you?
A. I believe so.
Q. Did you have to drag him in any way?
A. No.
Q. Was he walking on his own?
A. Yes.
Q. When you say you had his arm, did you have to assist him in walking?
A. He wouldn't have fallen down if I let go of him, but because he had pepper gas so I was directing him.
Q. Aside from directing him, showing him which way to go, did you have to in any way assist him like



carrying him or holding him up from falling?
A. No.
Q. Was anyone else assisting you assisting him?
A. No. I don't believe so.
Q. Where were Officers Pazzetta and Kemble?
A. Kemble had gone around to the other side of the car to remove equipment that was there Pazzetta opened up the door that I placed Mr. Kromah -- through which I placed Mr. Kromah into the car.
Q. Did you know that's what Officer Kemble was doing before he went to the car to take whatever was in there out?
A. Yes.
Q. How did you know there was equipment in the car?
A. Patrolman Pazzetta told him, I've got equipment on the seat.
Q. Did he say what kind of equipment?
A. No. I heard him say, "I got my bag."
Q. You observed Officer Kemble take it out of the car?
A. Yes.
Q. Which way was the car facing?
A. It was facing left wheels to curb in front of the house, facing generally in a southerly



direction.
Q. The driver's side would have been closest to where you were coming from, closest to the curb?
A. Say that again, please.
Q. The driver's side of the car would have been closest to the curb from which you were coming?
A. Yes.
Q. As you approach the car, you would have been approaching it from the driver's side?
A. Yes.
Q. Was Mr. Kromah placed in the back seat from the driver's side?
A. Yes, on the left rear seat.
Q. That would have been the back door, there were four doors?
A. Yes.
Q. When he was put into the car, he would have first entered the side from the driver's side?
A. Say that again, please.
Q. He would have entered the car from the driver's side in the back seat, though?
A. Yes.
Q. Where was he seated when he got into the car?
A. The left side.
Q. How was he seated?



A. Seated on the seat.
Q. How did he get into the car, by that I mean did he get in on his own?
A. Yes, at that time I put a hand on his shoulder so he wouldn't bang his head on the frame of the car on the roof.
Q. Why would he bang his head on the frame of the roof?
A. It's kind of close because there's a cage and because he had been sprayed with pepper gas, his vision appeared to be affected because it appeared to be irritated, so he wouldn't bang his head and get injured, that's common practice to help somebody into a car.
Q. Did he resist in any way?
A. No.
Q. So would you describe him as being compliant once he had gotten up?
A. Yes.
Q. When he was seated in the car, did he go in on his own -- aside from you helping him to bend down, so he wouldn't hit his head, was he moving on his own?
A. Yes.
Q. How did his legs go into the car?

A. He pulled them in.
Q. I'm sorry?
A. I think he pulled them in.
Q. Who?
A. He did.
Q. Did he lift his legs up as one would get into the car?
A. Yes.
Q. If I understand the way he was going into the car, his right side would have been --
A. First.
Q. -- closest and go in first. Did he lift his right leg up to get into the car and you helped him bend over?
A. I don't remember.
Q. But his right side would have gone in first?
A. Yes.
Q. He was facing the front of the car?
A. Yes.
Q. When he sat into the car, did you have to help him into the car to sit down?
A. No. Other than say, you know, make sure he didn't bang his head on the car.
Q. What was said to him?
A. Nothing.



Q. Where was Officer Kemble at this time?
A. I don't know if he had gone back on to the sidewalk to continue watching the house.
Q. Where was Officer Pazzetta?
A. He was still nearby.
Q. What did you observe of Mr. Kromah's condition before he was taken into the car?
A. Like I said, just he appeared to have been suffering the effects of pepper gas.
Q. What else did you observe?
A. That's it.
Q. Did you observe any other physical findings on him?
A. No.
Q. What kind of clothing was he wearing?
A. I don't recall.
Q. Do you remember whether he was wearing a short-sleeve shirt?
A. I don't recall. I'm sorry, I also observed that he had cuts on his hands.
Q. What kind of cuts?
A. They appeared to be relatively superficial, not too serious.
Q. When you say superficial, what do you mean by that?



A. Well, he wasn't -- he was bleeding but he wasn't bleeding profusely.
Q. Were the cuts limited to his hands?
A. No. He had some on his hands and arms.
Q. Did anyone attempt to give him any medical attention at the scene?
A. No.
Q. In your report you then go into the fact that the perimeter was maintained and Patrolman DeChristofano searched the interior of the house with his dog --
A. Yes.
Q. -- and the search was negative. Where were you while the search was taking place?
A. I was in the yard.
Q. You were where?
A. In the yard.
Q. In the yard in the back?
A. No, right along the side.
Q. And where was Mr. Kromah at the time?
A. He was in the police car.
Q. Could you see him?
A. I could see the car, yes.
Q. How far was the car from you while the search was being done?



A. Maybe 15 feet, give or take.
Q. Who was -- withdraw that. Was anything -- was anyone making sure that Mr. Kromah did not leave the car?
A. Well, we were standing close enough, we would have seen if he tried to escape.
Q. Did he try to escape?
A. No.
Q. What did you observe of him, his condition in the car?
A. Like I said, just the effects of the pepper gas.
Q. Could you see that from where you were standing?
A. At that point I wasn't looking for that.
Q. Now, in your report you say you were concerned the subject was still in the house, "I wanted to make sure there were no more perpetrators in the house before I let the elderly female occupants go back in." Where did you learn or how did you learn there were female occupants, elderly female occupants?
A. One of the patrolmen when I got there, they told me the house belonged to a couple of ladies.
Q. What were their names?
A. One of them was Emma Cervone.

Q. How did you learn that?
A. I don't recall. One of the patrolmen must have told me at the scene.
Q. Was a statement taken of her?
A. I don't know.
Q. Wouldn't you know that as the supervisor?
A. At that point it would have been up to somebody else to take the statement.
Q. As supervisor of this incident, wouldn't you have learned either at the time or after that a statement had been taken?
MR. PENZA: Objection to form. Of this incident? He never said he was the supervisor of this incident; supervisor at the scene.
Q. As supervisor at the scene, wouldn't you have learned either at the time or after whether or not a statement was taken from the woman whose name is Emma Cervone?
THE WITNESS: Could you please repeat that? I'm not sure I understood it.
Q. As supervisor at the scene, wouldn't you have become aware of a statement that would have been -- if a statement were taken from Emma Cervone?



A. In this instance, no.
Q. Why?
A. Because of the incident, it became the task of Internal Affairs to investigate it, it would have been their job to take a statement from her if they deemed it necessary.
Q. Whose responsibility would it have been at the scene to take statements from witnesses, such as Emma Cervone?
MR. PENZA: Objection. Assumes facts not in evidence. Go ahead, you can answer.
A. Who would have taken -- well, do you mean in the normal course of events?
MR. MONIZ: Yes.
A. In the normal course of events where a victim -- where a person is a victim of breaking and entering, there were witnesses, the detectives would have taken it. But because he died, it changed the course of events. It would become Internal Affairs investigation, not a detective investigation.
Q. Is there -- withdraw that. You learned that one of the officers spoke to the persons who lived there; is that correct?
A. I knew somebody had spoken to them.



Q. Do you recall when Officer Imondi testified he indicated he spoke -- I believe he indicated he spoke to the residents?
A. Okay.
Q. Do you recall that?
A. Yes.
Q. Would there be any reason why a witness statement, such as the ones that are marked 1 through 4, would not have been taken that evening by one of the officers at the scene from the alleged victims?
A. Yes. Because as, I said, because he died, it would have been the task of Internal Affairs to interview them.
Q. Was there any reason why before that happened, before Mr. Kromah died at the scene when officers were speaking to the so-called victims, they did not take statements?
A. Say that again, please.
Q. Would there be any reason why officers at the scene who were at the scene during the time this investigation was going on and before Mr. Kromah died, why any statement would not have been taken from the victims?
A. Yes. I mean, they pulled up, as they pulled



up, they observed him trying to go into the window and everything was happening, was still in progress. It wasn't a case where they pulled up and the person who was trying to break in was already gone. I mean --
Q. Once Mr. Kromah was apprehended and officers were standing around making observations of the place, when Officer Imondi went to speak to the neighbors, would the normal procedures have been for him to have statements from the people he spoke to?
A. Well, no, they would have had to be turned over to the detectives in the normal situation for the detectives to take a statement. It wouldn't be Patrolman Imondi that would take the statement.
Q. Do you know whether that occurred here?
A. I don't believe it did.
Q. Detectives did not, to your knowledge, take statements from the alleged victims, correct?
A. Correct.
Q. Do you know whether or not Internal Affairs did?
A. I don't know.
Q. If they had, would that be something that you would have been made aware of either as a defendant here or just in normal course?

A. Not necessarily.
Q. You don't know as you sit here now whether or not anybody from the police department took statements from Emma Cervone or any other person living in the house?
A. That's correct.
Q. You conducted a second search of the house after K-9 had done it?
A. Yes.
Q. With Patrolmen Imondi and Pazzetta, correct?
A. Yes.
Q. You then say, "Pazzetta informed me that he was going to transport the subject to the hospital for treatment"?
A. Yes.
Q. "For cuts he sustained on his arms and hands"?
A. Yes.
Q. Whose decision was that?
A. Well, it was -- it really wasn't -- it was obvious he had to go.
Q. Why was it obvious?
A. He had cuts to the hands, because of the cuts to his arms and hands, he had to go get treatment.
Q. When you say he had to go, what do you base that statement upon that he had to go?



A. Because it was more than just a little scratch or abrasion, it was something that would have needed either stitches or some type of dressing. As I said before, the sheriffs wouldn't take him in the morning.
Q. You called him superficial wounds earlier, correct?
A. Yes.
MR. PENZA: Objection to form. You mean these wounds were superficial?
MR. MONIZ: Yes.
MR. PENZA: He never said that. Objection to form.
Q. Was there anything about the nature of his injuries that would prevent you, by you I mean the officers at the scene, from taking him to the station for processing and then later, if necessary, having him sent to a hospital?
A. No. We were between a quarter mile and a half mile from a hospital. So it would have been a waste of time to drive to the station only to have to go back out and bring him to the hospital. It would have been pointless to do that. We had to go basically just about right by the hospital, so it's more efficient to just take him there.



Q. But you could have -- withdraw that. There is nothing of the nature of his wounds that would prevent the officers from taking him in for processing, and then determining whether or not he needed hospitalization before having him sent to the sheriffs in the morning?
MR. PENZA: Objection to form. You can answer.
A. It would have been a waste of time. Like I said, he would have been going to the station, he was bleeding, he couldn't get fingerprinted with blood all over him. He would have had to get cleaned up and treated for the cuts. So to go all the way down to the station, which would be further away than the hospital would have been a waste of time.
Q. When you say in your report that Pazzetta informed you he was going to transport the subject to the hospital, where were you and he?
A. In front of the house.
Q. And in front of the house, you're very close to the patrol car, correct?
A. Relatively.
Q. What observation did you make at that point, just prior to Officer Pazzetta indicating he was going



to take the subject to the hospital, what did you observe of Mr. Kromah at that time?
A. I don't think I observed anything of him at that time.
Q. Did you -- when he made the statement he was going to take him to the hospital, did you have any reaction to that?
A. I said, "Yeah, go ahead."
Q. Did you look to the car to see if he was still in the car?
A. No. There was no indication that he wasn't in the car. There were policemen out there. If he escaped or somebody allowed him to escape, that would have been seen by the police, so...
Q. How long was Mr. Kromah in the car before he was taken from the scene to the hospital?
A. Several minutes.
Q. Did anyone indicate that they would give him -- withdraw that. Do you have in the police patrol cars as part of your equipment, first aid kits?
A. There may be things in the trunk, I don't know.
Q. Isn't that something you would have as the regular part of the equipment as a patrolman, a first aid kit?

A. It may be, but we're not medically trained. We just take them to the professionals and let them.
Q. You're trained with regard to CPR and other things?
MR. PENZA: Objection to form. You can answer.
A. I was trained in the academy.
Q. Right. And are you trained in the use of first aid kits?
A. I don't remember if they trained us with those first aid kits or not.
Q. Is it your testimony that as far -- you don't know whether or not there is a first aid kit in each and every police car at the Providence Police Department?
A. I'm not sure.
Q. You're not sure?
A. Right.
Q. Would it come as a surprise to you if they did not have first aid kits in police cars?
MR. PENZA: Objection. Form. You can answer.
A. Not necessarily.
Q. Did anyone suggest that Mr. Kromah might need some



first aid at the scene?
A. No.
Q. What's the policy with respect to providing first aid at the scene?
A. Summon medical help, get him to a hospital.
Q. Are there situations under which the officers themselves would provide first aid?
A. There have been instances where people have done CPR on people.
Q. And how do you make a determination as to whether to summon first aid to the scene versus taking someone to a hospital for first aid or medical attention?
A. Say that again, please.
Q. How do you make a decision or determine whether to summon first aid help, rescue squad or other medical attention to a scene as opposed to taking an individual to the hospital without summoning medical attention?
A. Depends on the circumstances. There is no need to call a rescue for cuts on his hands. He could get him to a hospital sooner than a rescue.
Q. It's your testimony the only reason Mr. Kromah was taken to a hospital was because of lacerations?
A. Yes.



Q. You don't recall whether he was sitting up when the car left?
A. I don't recall.
Q. If he were laying down, would that have been something you would have noticed?
MR. PENZA: Objection to form. You can answer.
A. Not necessarily.
Q. I take it, what you're saying, you never observed Mr. Kromah lying down in the car?
A. No.
Q. Were you at all concerned about Mr. Kromah's condition?
A. Only that he had to get treated for his cuts. I mean, there was no indication there was anything more serious than cuts to his arms and hands.
Q. Were you surprised when you were summoned to the hospital?
A. Yes.
Q. Why?
A. Because I didn't expect that to happen to him.
Q. Were you ever asked to complete any more informative report than that contained in Exhibit 5?



A. No. No. Just the witness statement and the report.
Q. Is this the usual length of a report for an incident such as this?
A. A police report, yes, is just generally a brief summary of the incident.
Q. Now, if you would look at your uniform report there, where you indicated, "At approximately 2223 hours, police responded for a break in progress at 101 River Avenue, the residence of Emma Cervone." How did you know that when you did this report?
THE WITNESS: How did I know what?
Q. How did you know this was the residence of Emma Cervone?
A. Somebody evidently told me her name.
Q. Did you see it in writing anywhere?
A. Not that I recall.
Q. Do you remember who told you her name?
A. No.
Q. You certainly didn't know that of your own information?
A. Correct.
Q. Somebody had to give you that information?
A. That's correct.
Q. You then say, "Upon arrival, police observed a

# IMONDI DEPO

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROSELINE CHOLOPY, in her individual capacity nd as Administratrix of the Estate of ERIC A. KROMAH

vs. C.A. No. 03-284L

CITY OF PROVIDENCE; POLICE DEPARTMENT OF THE CITY OF PROVIDENCE; URBANO PRIGNANO, JR., individually and in his official capacity as Chief of Police of the City of Providence; SERGEANT LOPARDO, individually and in his official capacity; and JOHN AND JANE DOES 1-10, Supervisors and/or Employees of the City

DEPOSITION OF OFFICER MICHAEL IMONDI, a Witness in the above-entitled case, taken on behalf of the Plaintiff, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Olenn & Penza, LLP, 530 Greenwich Avenue, Warwick, Rhode Island on September 8, 2005 at 1:15 P.M.

APPEARANCES:

FOR THE PLAINTIFF......LAW OFFICE OF JOSEPH MONIZ
BY: JOSEPH MONIZ, EQUIRE
100 ALLYN STREET
HARTFORD, CT 06103

FOR THE DEFENDANTS.....OLENN & PENZA, LLP
BY: JOSEPH F. PENZA, JR., ESQ
530 GREENWICH AVENUE
WARWICK, RI 02886

ALSO PRESENT: Roseline Cholopy and Kenneth Lopardo

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

that were in his home were okay?
A. I did not.
Q. Why not?
A. I was trained on the door.
Q. What was your person that told you that information go?
A. I have no idea, sir.
Q. Why were you trained on the door?
A. I was watching to see if anybody was going to come out.
Q. Then, at some point did the K-9 come before you left that spot?
A. I don't recall the exact sequence of time of when the K-9 got there, sir.
Q. Where were you when the K-9 got there?
A. Standing in front.
Q. So, you were still there at the front when the K-9 came?
A. Yes, sir.
Q. You had not left that position?
A. No.
Q. Was that a procedure that would have been followed that you let the K-9 go in there?
THE WITNESS: Before anybody else?
MR. MONIZ: Right.



A. Yes, sir.
Q. Were you aware from your radio that the K-9 was on its way?
A. Yes, sir.
Q. So you knew at some point they were going to arrive?
A. Uh-huh.
Q. Was it your intention to stand there to make sure no one left the house before the K-9 got there?
A. That's correct.
Q. Was there anyone else stationed, if you know, to any other part of the house?
A. I'm not sure. I assume there was.
Q. Once the K-9 went through the house, did you have any conversations with the officer who had the K-9?
A. I don't believe so.
Q. You learned at some time there was no one found in the house?
A. Correct, sir.
Q. When did you leave that position at the corner of the house?
A. I would say probably after -- you will have to bear with me for a minimum, it's five years ago. I don't recall, sir, when I actually left



the perimeter of the house. Everything was in close proximity on the street and the house and everything is in close proximity to each other.
Q. Do you remember when you left there, you thereafter at some point went into the house to search it a second time?
A. Yes, we did.
Q. That was you and Pazzetta, was it? I'm sorry, you and officer -- you say, "I advised Officer Kemble of this, arrived and did a sweep of the home. At this time myself along with Sergeant Lopardo and Officer Pazzetta did a second sweep." So it was the three of you?
A. Yes.
Q. But you don't remember whether you observed the individual in the car lying down before or after you did the sweep?
A. I don't recall, sir.
Q. What did you do after you saw him lying in the car?
A. I believe I went back to where I was before right in front of the house.
Q. The corner?
A. Yes, the corner of the house in front.
Q. Would that indicate that would have been before



you did the second sweep?
A. Not necessarily, sir.
Q. Why would you go back to the corner?
A. There have been times in the past when we've missed people inside the house that I've been involved with. I've missed someone inside a house before.
Q. So the fact there were two sweeps, one with a K-9 wouldn't indicate whether you were going back to the corner before or after the sweeps?
A. If you could rephrase that for me, sir.
Q. The fact that you went to that corner after you saw the person in the car wouldn't necessarily mean that it was after the sweeps were done or before the sweeps were done?
MR. PENZA: Objection to form. Facts not in evidence, sequence of events. Go ahead.
Q. Do you understand the question?
A. No.
Q. If the two sweeps were done and you found nobody, would there be any reason for you to be at the corner?
A. No.
Q. But you recall doing that after the two sweeps were done?

# PAZZETTA AFFIDAVIT

JFP:jlb:pac 95326 \pleading\95326affpaz

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| ROSELINE CHOLOPY, In Her Individual Capacity and as Administratrix of the Estate of ERIC A. KROMAH | ) | |
| VS. | ) | C.A. NO. 03-284L |
| CITY OF PROVIDENCE, ET AL | ) | |

**AFFIDAVIT OF VINCENT PAZZETTA IN SUPPORT OF THE DEFENDANT, KENNETH LOPARDO'S, MOTION FOR SUMMARY JUDGMENT**

I, Vincent Pazzetta, make affidavit and state as follows:

1. On July 28, 2000, I was working the third shift (11:00 PM to 7:00 AM) in the patrol bureau of the Providence Police Department.

2. I responded to a call of a break in progress at 101 River Avenue at approximately 11:30 PM.

3. I was the first officer to arrive at the scene and park my police car in front of 101 River Avenue.

4. Patrolman Edward Kemble ("Kemble") responded to the scene immediately thereafter.

5. Kemble and I started to walk around the left side of the house at 101 River Avenue when I heard glass breaking in the rear yard.

6. Kemble jumped the fence at the northwest corner of the house at 101 River Avenue.

7. I ran around the right side of the house in case the perpetrator attempted to flee in that direction.

8. When I got to the rear of the house I observed Kemble struggling with a black male subject who is later identified as Eric Kromah ("Kromah").

9. I then joined that struggle in an attempt to bring Kromah under control.

10. During that struggle Kemble used his department issued pepper spray in the general direction of Kromah. However, I do not believe he made a direct hit in Kromah's face. Kromah was then handcuffed by the two of us.

11. In response to Kemble's question if anybody was with Kromah, he responded that his friend was in the house.

12. I then put out a police broadcast that we had a subject in custody and there might be another subject in the house. I requested a K-9 Unit to respond to the scene.

13. The dispatcher instructed me to set up a perimeter and not to enter the house.

14. Kemble and I picked up Kromah off the ground and began to escort him to my police car which had been parked in front of the house.

15. Halfway down the walkway leading to the front of the house, Kromah dropped to his knees.

16. I thought he might be suffering from the effects of the pepper spray so I allowed him to sit there for a while.

17. At that time Sergeant Kenneth Lopardo ("Lopardo") arrived at the scene.

18. Lopardo and Kemble went to the rear of the house while I stayed with Kromah who was still on the ground.

19. Lopardo came back to where I was with Kromah and directed me to secure the front of the house and await the arrival of the K-9 Unit who would conduct a complete search of the house.

20. I went to the front of the house and left Kromah with Lopardo.

21. I next saw Lopardo escorting Kromah to my police car. I assisted Lopardo in placing Kromah in the police car.

22. When the K-9 Unit arrived (Patrolman Albert DeCristofano) I stood at the front door inside the house while DeCristofano searched the house with his dog.

23. After the search was completed Lopardo, Patrolman Michael Imondi and I searched the house one more time to ensure that no one was in it.

24. After that search was completed, I advised Lopardo that I would take Kromah to the Roger Williams Hospital to be treated for the cuts he had sustained to his arms when he broke the window at the rear of 101 River Avenue.

25. The ride to Roger Williams Hospital is less than a half mile away from 101 River Avenue.

26. Upon arrival at the hospital I noticed that Kromah had slumped down onto the seat of the rear of the police car.

27. I opened the door to the rear of the police car and noticed that Kromah was unresponsive.

28. I then ran into the emergency room at the Roger Williams Hospital and retrieved a gurney.

29. Patrolman Jin O. had followed me to the Roger Williams Hospital and assisted me in placing Kromah onto the gurney.

30. We then took Kromah into the emergency room where hospital personnel took over.

Vincent Pazzetta

Vincent Pazzetta

Subscribed and sworn to before me this 20th day of September, 2005.

Barbara Malachowski

Notary Public

My commission expires: 4/26/08