UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ROSELINE CHOLOPY, In Her Individual Capacity and as Administratrix of the Estate of ERIC A. KROMAH | : | CIVIL ACTION NO. 03-284L |
| Plaintiff | : | |
| VS. | : | |
| CITY OF PROVIDENCE, ET AL | : | |
| Defendants | : | JANUARY 12, 2006 |

**OBJECTION TO DEFENDANTS' MOTION FOR SANCTIONS**

## I. INTRODUCTION

Defendant Lopardo by motion certified on December 19, 2005 seeks sanctions against Plaintiff's counsel under Fed. R. Civ. P. 11(b)(1) and (3) as a result of the filing of Plaintiff's Motion for Reconsideration, filed October 26, 2005. By that motion, Plaintiff sought reconsideration of the Court's ruling of May 25, 2005, granting the newly named defendant officers' motion to dismiss based upon a running of the three year statute of limitations. The names of the officers who arrested her husband were first made known to the Plaintiff through discovery responses on December 8, 2003, while she was representing herself in a pro se capacity. The disclosure of names of officers involved in Eric Kromah's

arrest and death included the arresting officer Edwin Kemble and Vincent Pazzetta, the officer who assisted him in restraining Kromah. Kromah died on the way to Roger Williams Hospital while in the back seat of Pazzetta's cruiser. Upon receiving the names of these offices, Plaintiff immediately amended her complaint to include them as parties, and shortly thereafter was able to retain local counsel after an exhausting search that began shortly after her husband's death.

The taking of depositions was done under the Scheduling Order, and the Plaintiff scheduled the depositions of all the named officers, including Sgt. Lopardo and a representative of the Medical Examiner's Office during the months of August and September, 2005. During the deposition of officer Kremble on September 8, 2005, in response to the question: "To whom did you give the statement?"[1], officer Kremble responded: "It beomes a part of the police report, police package." It was this testimony in addition to other factors in this highly unusual death case, which lead to the filing of the Motion for Reconsideration. If taken literally on its face as true, including the additional descriptive words following the comma[2], one could reasonably conclude that the police

[1] Kremble's "Witness Statement" dated July 28, 2000 which was a part of the December 8, 2003 disclosure was marked as an exhibit at the deposition, and he was asked questions about the circumstances under which he gave it.
[2] Defense counsel makes much of this modifying description of Kremble's response and concludes without any evidentiary support that "While he initially made reference to the witness statement being part of the "police report", he obviously knew that was in error and in the very next two words corrected himself by saying "police package." Def. Mem. 12/19/05 at p.3.

report included the statements of the arresting police officers, i.e., those officers involved in the incident leading to the arrest. In fact, Defendant in its memorandum of law in opposition to the motion for reconsideration at issue here states: "A police report contains pertinent information regarding (among other things) the date, time and place of the offense, the type of crime involved, information regarding the arrested individual, **and a brief narrative by one of the officers who was involved in the incident.**" Def. Mem. 10/31/05, p.1. (Latter emphasis added.)

The Plaintiff's motion while triggered by this testimony of Officer Kremble was filed in the context of highly unusual circumstances surrounding the reporting by the Providence Police Department and Sgt. Lopardo regarding the death of Eric Kromah, which , in and of itself, was highly unusual. First of all, the incident report by Lopardo was a twelve line, one paragraph report which gave no first hand report by or included the names of any of the officers involved in the arrest of the decedent. Secondly, the Plaintiff's investigator was given a "Uniform Report" of Sgt. Lopardo of the incident by the Providence Police Department within weeks of the death of Kromah, which included a second page that was blank, except for the title at the top and Lopardo's name at the bottom. Sgt. Lopardo disclosed through discovery on December 8, 2003 a "Uniform Report" of the same incident, which differed in critical respects from the "Uniform Report" given the plaintiff's

investigator in September, 2000. Finally, the decedent died under very unusual circumstance – he was taken into custody after a "brief struggle" according to Lopardo's report, but was according to the arresting officers apparently alright when he was placed into the police cruiser. Somehow, however, Kromah was dead on arrival at Roger Williams Hospital. Finally, the cause of death indicated by the medical examiner within three days of the incident was extreme cocaine intoxication. A private pathologist hired by the Plaintiff who could not believe that her husband ever used drugs concluded that the decedent had no drugs or alcohol in his body at the time of his death. He attributed the death to excited delirium, i.e., brought on as a result of an escalation of force by the officers, combined with protective resistance by the decedent.

It is in this context of highly unusual circumstances that the Court must review the Defendant's motion. Defendant cites no case law in his motion, but it is well established law in the First Circuit that Rule 11 prohibits any filing that is 1) being presented for any improper purpose, such as to harass or delay proceedings, or 2) where after reasonable inquiry a competent attorney could not form a reasonable belief that the filing is well grounded in fact. As to the first element, clearly the purpose of the motion was not for an improper purpose, since as argued by the moving Defendants in separate summary judgment motions following the dismissal of the officers who were the subject of the Motion to

Reconsider, without the "newly named officers" as parties, the case must be dismissed.[3] Obviously, a motion seeking reconsideration of the dismissal of necessary is not without purpose, since it may be the only way for the case to go forward on the merits. As to the second element, the inquiry made by counsel was Kremble's testimony in context of an already unusual situation. It is in this context that the Court must determine whether there was a violation of Rule 11.

## II. FACTUAL BACKGROUND

On the night of July 28, 2000, Eric Kromah was placed under arrest by the Providence Police, allegedly for attempting to break into the home of Emma Cervone, located at 101 River Avenue in Providence. According to the one paragraph Uniform Report ("Report") of the incident, while attempting to apprehend Kromah "a brief struggle ensued during which the subject was given a short blast of department issued pepper gas", after which he was taken to Roger Williams Hospital for cuts he received when he broke the window of the house. Kromah was found unresponsive on arrival at the hospital and later pronounced dead. On August 1, 2000, just three days after Kromah's death, the Medical Examiner reported that he died of "a sudden cardiac arrhythmia due to acute cocaine intoxication." (Med. Ex. Pub. Rel., attached.)

[3] At oral argument on the Motion for Reconsideration, we conceded that if the officers involved in the arrest and subduing of the decedent are not parties, then summary judgment would likely enter.

According to the testimony of Roseline Cholopy, wife of the deceased, she knew the decedent as a person who never used drugs or alcohol. As a result of her disbelief, Cholopy contacted the family of the undersigned who is from Rhode Island, and as a result, the undersigned arranged immediately for a private autopsy to be performed on Kromah. An autopsy was performed by Dr. Louis S. Roh of White Plains, New York on August 10, 2000, and a separate toxicological examination was performed by National Medical Services, Inc. of Pennsylvania. (See attached Autopsy Report.) The toxicology report came back negative for cocaine in the blood sample taken at the autopsy done by Dr. Roh. Dr. Roh concluded that Kromah died as a result of "excited delirium."

As a result of these conflicting medical findings, the undersigned at the request of Cholopy contacted an investigator, Emmet Sheehan, who was experienced in homicide cases and had experience with such cases in Providence, Rhode Island. On or before September 27, 2000, Sheehan went to the Providence Police Department ("PPD") to request all police reports[4] and was given a two page report, the second page of which was blank except for the title portion and box 34 with Sgt. Lopardo's name in it. The report contained only the name of one police officer - Sgt. Lopardo.

Cholopy then began a lengthy process of trying to obtain local counsel to represent her,

[4] In his affidavit of November 10, 2005 Sheehan avers that he sought "witness statements", and was told that none existed. While he was not as clear in his testimony, the affidavit is what counsel had to consider. We address this

and contacted over seventeen lawyers from Rhode Island, and even contacted lawyers in Massachusetts, Connecticut and New York to no avail. (See 9/10/04 Affid. Of Cholopy.) Having failed to obtain a lawyer in Rhode Island to represent her, Cholopy and Nellie Francis made three visits to the Providence Police Department just before filing the complaint to request the names of the officers involved in the arrest and subsequent death of her husband in order to include them in the suit. According to her testimony and the testimony of Francis, they were told that they would have to get a lawyer to get the records they were requesting, i.e., the names of the officers involved. According to the testimony of Officer Lima of the PPD, the Kromah file was sent to IAD immediately following the incident, and it remained there as of the date of his testimony. He testified that for someone to get the statements of the officers, he or she would be required to file a complaint or subpoena the file

Having failed to obtain the names of the officers involved other than Sgt. Lopardo, Cholopy filed the wrongful death complaint as a pro se on July 3, 2003, less than one month before the statute of limitations ran.

Discovery commenced in September, 2003, and thereafter the then pro se Plaintiff requested reports of the incident, including the names of the police officers involved in the arrest and subsequent death of her husband. By timely response on December 8, 2003, plaintiff was

---

issue in Section III herein.

provided copies of a one page Uniform Police Report[5] and the "Witness Statements" of officers involved in the arrest, including that of officers Edwin Kemble and Vincent Pizzatta who arrested and subdued the decedent. The Plaintiff moved to amend her complaint on December 12, 2004 to add the names of the "new defendants", which for filing technicalities was denied without prejudice. Plaintiff re-filed her motion on January 26, 2004 and it was granted by the Court on June 1, 2004. The "new defendants" on July 8, 2004 filed motions to dismiss the Amended Complaint based upon a running of the three year statute of limitations. Cholopy was finally able to secure a local attorney who, although inexperienced in such cases, agreed to work with the undersigned.[6] An appearance by Attorney Alton Wiley and the undersigned by application to appear pro hac vice was filed on June 21, 2004, which the Court thereafter granted. The Court on May 25, 2005 granted the defendants' motions to dismiss. Discovery in the way of the taking of depositions was then undertaken by Plaintiff's counsel.

During the taking of the deposition of officer Kemble on September 8, 2005, he indicated that in preparation for his deposition he had reviewed his own witness statement, the statements of the other officers and the Uniform Report. (Kemble dep., p.11.) Nine questions later Kemble, was asked to whom he gave his statement, to which question he responded: "It becomes

[5] This report differed in critical ways from the report given to Sheehan three years earlier, which we shall address below.

[6] In this regard, I would represent to the Court that Attorney Alton Wiley was not involved in the decision to file the Motion for Reconsideration and was unaware of the history which lead to its filing. That decision was made by the

part of the police report, police package." (Kemble dep., p.12.) Based upon this testimony, undersigned counsel indicated an intention in an October 19, 2005 letter to Magistrate Judge Hagopian to seek reconsideration of the Court's ruling dismissing "new defendants" based upon a failure to disclose a part of the police report. In response to this letter, Attorney Penza wrote the undersigned on October 20, 2005 to explain that a computer glitch caused the second page of the report (the one given to Sheehan in September, 2000)[7] to be blank. However, the reference to a failure to disclose in the October 19th letter was based upon Officer Kemble' testimony that his statement was a part of the "police report, police package."

## III. ARGUMENT

### A. Legal Standard.

Rule 11(b) of the Rules requires that an attorney by signing a filing "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,- (1) it is not being presented for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation; ... [or] (3) the allegations and other factual contentions have evidentiary support..." In an early decision

---

undersigned alone.

[7] Apparently, Attorney Penza was unaware of the existence of the version of the Uniform Report given to Sheehan until it was used as an exhibit during the depositions of the officers, which in view of the testimony at the recent hearing makes sense. And, it was not until testimony was provided at that hearing that the undersigned learned that the Sheehan version of the Uniform Report was modified **after** the original one paged version, which provided through discovery on December 8, 2003.

interpreting the then recently amended Rule 11, the First Circuit held in relevant part that: "In sum, Rule 11, in its present incarnation, should be read as requiring sanctions 'when it appears that a pleading has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact…'" Lancellotti v. Fay, 909 F.2d 15,19 (1st Cir. 1990), quoting from Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 253-54 (2d Cir. 1985). The Court went on to state that "the 'new' Rule contains not one, but two, grounds for sanctions: the 'reasonable inquiry' clause, … and the 'improper purpose' clause." *Id.* (Citations omitted.) In a more recent decision, the First Circuit reiterated the two grounds for sanctions, stating that Rule 11 prohibits "filings made with 'any improper purpose,' the offering of 'frivolous' arguments, and the assertion of factual allegations without 'evidentiary support' or the 'likely' prospect of such support.'" Young, et. al. v. City of Providence, et. al., 404 F.3d 33, 39 (1st Cir. 2005). The Court in Young cited Rule 11 as requiring that factual contentions have "evidentiary support only 'to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances.'" *Id.* The Court also stated that the "general rule is that statements must be taken in context…" *Id.* at 41, citing United States v. Moran, 393 F.3d 1, 16 (1st Cir. 2004).

Finally, in the Comments to the 1993 Amendment to Rule 11, the purpose of which was to place "greater constraints on the imposition of sanctions and should reduce the number of

motions for sanctions presented to the court", the Advisory Committee notes:

> ...if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient "evidentiary support" for purposes of Rule 11.

Advisory Committee Notes, 1993 Amendments to Rule 11.

**B. <u>The Motion to Reconsider Was not Filed for any Improper Purpose</u>.**

The Defendant claims that Plaintiff's Motion to Reconsider violated Rule 11(b)(1), which prohibits any filing that is "being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." In reviewing the Defendant's memorandum of law, the only portion that appears to cover subsection (b)(1) is one sentence on page 6, which states: "Moreover, the filing of the memoranda caused unnecessary delay in moving forward with this case and greatly increased the cost of litigation." The Defendant offers no support for this assertion, other than his claim that there was no good faith basis to the allegations of fraudulent concealment. That claim is covered by subsection (b)(3), which we address in Section C. below.

In fact, the Plaintiff's motion was filed for a very critical purpose, i.e., without the presence of the officers involved in the arrest and subduing of the decedent, the Defendant's themselves argue in their summary judgment motions that the case as to the remaining

defendants should be dismissed. In view of the testimony elicited at the depositions of the officers involved, including Sgt. Lopardo, that is a very likely result. Thus, the purpose of filing the motion, literally, was to permit the Plaintiff's suit to be heard on its merits. And, as we argue below, there was a basis in fact, as well as a reasonable inquiry made by undersigned counsel into the factual contentions that formed the basis of the filing of the motion. Whether the allegations had factual support and the inquiry was reasonable is for this Court to decide, however, there is absolutely no evidence that the filing was for an improper purpose. The purpose for the filing was to bring before the Court the parties whose actions on the night in question would support the Plaintiff's claim that their use of excessive force caused her husband's death, or they would not. Without their presence as parties, this case in all likelihood will not be heard on the merits of the Plaintiff's claims.

**C. <u>The Allegation of Fraudulent Concealment Was Based Upon Evidence and a Reasonable Inquiry Under the Circumstances of this Highly Unusual Case.</u>**

The Defendant in his Memorandum of Law seems to claim that three statements by the undersigned in the Motion to Reconsider violate Rule 11(b)(3), because "[p]rior to submitting their[8] memorandum and reply memorandum in support of their motion for reconsideration, they made absolute[ly] no inquiry that provided them with a good faith basis to make the scurrilous accusations set forth in those documents." Def. Mem. at p. 6. Those statements taken from

Plaintiffs memorandum are:

- "We now know that there are at least two reports prepared by Sergeant Lopardo."
- "...it raises the question of how and why a portion of this form was removed from the second page of the Uniform Report given to the Plaintiff's investigator."
- "That report and/or package was fraudulently concealed from the Plaintiff by the defendants, the City of Providence and Sgt. Lopardo."

As to the statement that there were at least two reports prepared by Sgt. Lopardo, Defendant's counsel himself admits that "...one might understand how counsel could argue that there were two separate reports prepared by Lopardo..." Def. Mem. At p. 5. And given the circumstances under which the two different reports containing the exact same entry of Sgt. Lopardo's name in box 34 of the reports, it would be reasonable to conclude that Sgt. Lopardo authored both reports.[9] As it turns out according to the testimony presented at the recent hearing, the report first given to the Plaintiff through her investigator was actually changed - apparently by Detective Mansolillo[10] according to the inscription at the bottom of the report – after the original report was sent to IAD on the night or early morning following the

---

[8] I, again, note that any responsibility for the statements made in the motion were mine, and that Local Counsel who is inexperienced in these cases had no involvement in making the arguments.

[9] This is an important issue, because it would lead one reasonably to question Lopardo's motives in altering the information regarding the victim, who was a witness, in the report given to Sheehan

[10] This is also confirmed by Defendant's Exhibit A offered at the hearing, which indicates that " VANSOLILLO" printed the report on September 25, 2000, just two days before Plaintiff's investigator faxed the report to the undersigned. (See Pl. Exh. 1 from the hearing.)

death of Kromah. However, under the circumstances that the report was originally given to the Plaintiff shortly following the death of her husband, one could only conclude that it was the report of the person whose name appeared at the bottom of it, i.e., Sgt. Lopardo. Thus, when Lopardo through discovery disclosed what is represented to be his report, which after careful review appears to have significant differences from the report provided earlier, one would reasonably conclude that he had prepared two different reports, as conceded by Defendant's attorney.

The Defendant cannot prevail on its claim regarding the statement that there were at least two reports prepared by Sgt. Lopardo, since it was reasonable under the circumstances to conclude that he had prepared both versions of the reports. Young, *supra.* at 41.

The statement by the undersigned regarding the question raised as to "how or why a portion of this **form** was removed from the second page of the Uniform Report given to Plaintiff' investigator was misinterpreted by Defendant's counsel as referring to "certain documentation" being from page two of the report. That is not what was stated in our memorandum. The clear and unambiguous language referred to a portion of the "form" being removed. During the deposition testimony Sgt. Lopardo, he indicated that the Uniform Report is done on a form. This was confirmed by testimony offered by him at the hearing. The statement regarding the missing portion of page two of the report given to Plaintiff's investigator referred

to the fact that a portion of this form, not "documents" was missing. Again, this would be the only reasonable conclusion one could draw if this were in fact a form that contained boxes 1 through 34, but only the title and box 34 was printed.

Additionally, the significance of this missing portion of page two related to the fact that the report given to Sheehan on or before September 27, 2000 did not include in boxes 10 through 22 of page one information about Emma Cervone, the alleged victim and a witness to what happened that evening.. The report given to Sheehan contained information about Kromah instead of Cervone in those same boxes. Comparing the two reports side by side, one could reasonably conclude that someone removed the information regarding Emma Cervone from page one of the report given to Sheehan, and replaced it with information about Kromah. If it were reasonable to conclude that Sgt. Lopardo prepared the report given to Sheehan, as the Defendant apparently does, then it would follow logically that he removed the information regarding Cervone. The fact that that turned out to be incorrect is not the issue. The issue is whether under the circumstances presented, it was reasonable to conclude at the time that it was Sgt. Lopardo who prepared the report given to Sheehan. Young, *Id.*

As to the statement that the "report and/or package" was fraudulently concealed from the Plaintiff, the Court must examine the context in which the statement was made. United States v. Moran, *supra.* at 16. In this case, the context within which the statement was made is that of a

highly unusual incident that resulted in the death of the Plaintiff's husband. According to the police report and testimony of the officers involved, there was a minor struggle with Kromah, followed by a "short blast"[11] of pepper spray, as described in Lopardo's report. He was then taken to a police cruiser without incident, then taken to Roger Williams Hospital, not because of the struggle or any state of intoxication, but instead for some minor cuts he received allegedly from breaking a window in the back of 101 River Avenue. Kromah is then reported to be "unresponsive" upon arrival at the hospital, after which he is pronounced dead. Three days later, the Medical Examiner in a public release indicated that Kromah died from acute cocaine intoxication.[12] Thereafter, the Plaintiff had an autopsy performed by a private pathologist, who had a separate toxicology report done at another laboratory. The toxicology examination concluded that there was no cocaine in the blood of the decedent, and the autopsy concluded that the decedent died as a result of a phenomenon known as Excited Delirium. Incredibly, in the face of all of this, the Plaintiff's investigator is given a police report that is one paragraph in length, and lists only the name of the officer who prepared the report, and has a second page that appears to have information missing. Matters were made even worse when through discovery the plaintiff is given a different version of the one-paragraph report of Sgt. Lopardo.

In addition to the rather unusual circumstances detailed above, the Plaintiff through her

[11] In his "Witness Statement" , officer Kemble described it as a "short burst" of pepper spray.
[12] Further complicating matters is that it is generally known that it takes weeks for a toxicology examination to be

investigator, and then on her own on three separate visits to the Providence Police Department, was unsuccessful in getting the names of the officers involved in this very unusual incident so that she could name them in a lawsuit she intended to file. Under these circumstances, one would have good reason to suspect that information regarding this incident was being withheld from the Plaintiff. The two separate reports which appeared to have been prepared by Sgt. Lopardo raised the most serious questions, both because of the absolute paucity of information and the fact that two versions that differed with regard to critical information about the victim. None of the officers who testified at the hearing could offer an explanation of why the reports would contain different information, or why the report given to Sheehan had been altered.

It is in the context of all of this that Kemble's testimony triggered a reaction by the undersigned. If Kemble's testimony were believed, his witness statement was a part of the "police report, police package." This would make sense, in that, for one thing, it would explain the otherwise lack of any real information about this incident in Lopardo's report. Additionally, while the Court did not allow Sheehan to testify as to his experience regarding what should be in a police report regarding a homicide, it certainly would be permissible for purposes of whether it was reasonable to conclude that such a report normally would include the names of the officers involved in the arrest and subduing of a suspect. Defendant without any evidentiary support

---

completed, which was confirmed by the Medical Examiner's representative in his deposition.

makes the conclusive opinion in his memorandum that "notwithstanding everyone's knowledge that witness statements are not the same thing as a police report[13], counsel for plaintiff relied solely on Officer Kemble's misspoken words…" It is the experience of the undersigned, who has practiced criminal law for over 30 years, including trying to verdict at least six murder trials, that police reports, particularly in homicides, include far more information than what appeared in Lopardo's report, and that the name(s) and information of the arresting officer is always in such reports.

Thus, Kemble's testimony was reviewed in view of the circumstances of this case and the experience of both Sheehan and the undersigned. If Kemble's testimony were viewed in the light most favorable to the Plaintiff, as would be the standard for summary judgment, then clearly it would be reasonable to conclude that his statement was a part of the police report prepared by Sgt. Lopardo. It is under this summary judgment standard that the Court must view the evidence presented, i.e., the testimony of Kemble that his statement "becomes a part of the police report, police package."[14] Advisory Committee Notes, 1993 Amendment. This testimony

---

[13] Ironically, it was as a result of the objection by Defendant's counsel who now gives this opinion that Sheehan was prevented from giving testimony regarding his experience of whether police statements are normally a part of the report. That is critical, because that is an additional factor that was considered by the undersigned.

[14] Defense counsel argues that Kemble's words were "misspoken" and that he immediately corrected himself. There is nothing in the transcript that suggests that Kemble was trying to correct himself. He did not say, for example, "the statement becomes a part of the police report, I mean police package." Nor did defense counsel ask him to clarify what he meant, as he could have if in fact counsel believed this to have been a misstatement. Additionally, at the beginning of the deposition Kemble was instructed by the undersigned "if you don't understand any of the questions, please ask me to rephrase it, or if at any point you want to clarify an answer you've given,

by Kemble if credited gives the clear impression that his statement became a part of the Lopardo police report. The issue for Rule 11 purposes, however, is whether under the circumstances of this case it was reasonable to conclude that the statement of Kemble was a part of the police report. Young v. City of Providence, *supra.*

However, the inquiry by the undersigned did not end with the testimony of Kemble. In a conversation with investigator Sheehan following the deposition of Kemble, the undersigned was told that Sheehan had requested statements of witnesses involved in the arrest of Kromah. Thereafter, the undersigned prepared an affidavit based upon this conversation and forwarded it to Sheehan for his signature, which he signed before a notary. The affidavit clearly states that Sheehan went to the station to get copies of all available information, including witness statements. He then states that based upon his experience, he knew there would be more information, and "insisted that there had to be more information, including reports or statements of all the officers involved, but was told in no uncertain terms that there were no such reports or statements…" While his testimony varied as to this point, what counsel had was an affidavit which indicated that the investigator was told that no statements or reports of officers existed. Counsel was also aware of the discrepancies between the report given to Sheehan and the one disclosed by Lopardo. In this context, it was reasonable to conclude that witness statements of

please feel free to do so. If you want to change anything that was said, please feel free to let me know there is something you want to change." (Kemble dep. at p. 4.) (Emphasis added.)

the officers involved was intentionally concealed from the Plaintiff.

The Court in its remarks denying the Motion to Reconsider essentially found that the Plaintiff, or better yet, her counsel[15], should have done more to get the questioned witness statements. Whether or not that is true, that is a different issue than what is before the Court in the present motion. The question here is whether it was reasonable to believe under the circumstances detailed above that the defendants had intentionally concealed from the Plaintiff statements of the officers involved in the arrest and subduing of Eric Kromah. Under the standards set in Lancellotti v. Fay, *supra.*, and Young v. City of Providence, *supra.*, we believe that there was violation of Rule 11 by the filing of the Motion to Reconsider.

## IV. CONCLUSION

The Plaintiff respectfully requests that the Defendant's motion be denied for all the reasons stated herein.

[15] The Court criticized the undersigned for not doing more in the time following the death of Kromah to get the full police package. However, while the undersigned did assist the Plaintiff from the very beginning in view of the relationship between his family and her, he could not act as her attorney since he was not licensed in the State. According to Officer Lima, Plaintiff needed to subpoena or file a complaint. Plaintiff was told she needed an attorney. The undersigned could not have acted in that capacity until the pro hac vice motion was granted, which was not done until long after the statute of limitations had run.

PLAINTIFF

By____________________________
Joseph A. Moniz
Moniz & Associates
100 Allyn Street
Hartford, CT 06103

And

By____________________________
Alton Wiley, Jr., Esq.
Local Associate Counsel
R.I. Bar #3337
960 Reservoir Avenue, Suite 22
Cranston, R.I. 02910
Her Attorneys

**CERTIFICATION**

I HEREBY CERTIFY that the foregoing was sent via facsimile on this 12th day of January, 2006 to counsel of record listed below.

Kevin F. McHugh, Esq.
CITY SOLICITOR'S OFFICE
275 Westminster Street
Suite 200
Providence, RI 02903

Joseph F. Penza, Jr., Esq.
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886

____________________________
Alton Wiley, Jr., Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ROSELINE CHOLOPY, In Her Individual Capacity and as Administratrix of the Estate of ERIC A. KROMAH | ) | |
| VS. | ) | C.A. NO. 03-284 L |
| CITY OF PROVIDENCE, ET AL | ) | |

## AFFIDAVIT OF ROSELINE CHOLOPY

I, Roseline Cholopy, Administratix, and Plaintiff of Said Case, on Oath, depose and state as follows in suport of Mr. Joseph Moniz Esq to represent me in Said case during the Pre-trial Settlement conference and other hearings as well as the Trial of this case:

1. That Mr. Joseph Moniz has a Long History to this case from the beginning, when My husband, Eric B Kromah died in July of 2000.

2. That Mr. JOseph Moniz was the one that filed all of the necessary documents in regards to this case in July of 2000.

3. That Joseph Moniz was greatly involved in the handling of this situation of my late husband's death for more than one and half years, that is up to 2002, when I lost complete contact with Mr. Moniz.

4 That I tried to contact Mr. Moniz from 2002 to the Filing of this case in June of 2003, but to no avail. After numeonous attempts, failed to get a Lawyer to represent me, and no contact with MrMoniz, I decided to filed the case against the City of Providence et all in JUne of 2003, as a pro-se plaintiff.

5. That Mr. Moniz is the person who arranged for an Independent Autopsy to be performed on my late husband, mr. Kromah. In the Independent Autopsy it was found that My Late Husband did not die from cococaine etc. Not have cocaine in.

6. That Mr. Moniz has the Expertise, long Standing Expereince withPolice brutality cases with citizens, resulting into death. Mr. Moniz understands and has the know how to represent me so as to be fairly and not prejudice my case, by only allowing Mr. Alton Wiley Jr. alone to represent me.

-2-

7. That Mr. Alton Wiley, Jr. has never or have represented any person or client in Such a case of Death by the city.

8. That Mr. Wiley, Jr. has told me that he lacks the expereince for the first time in representing client with such a Wrongful Death case, He will need an experienced lawyer as Mr. Moniz is to carry the case on.

9. That I will be prejudice and treated unfairly not to have Mr. Moniz represent me with all of the long time standing, experience, expertise in representing me in this Wrongful Death suit. I will not be fairly legally, equally faithfully represented, and thus leaves me Unjustly represented.

10. That I have made a lot of sacrifces in obtaining legal representation for this case, before I filed it and after I filed it. There was No lawyer or no one in the State of Rhode Island to represent me. I also tried in obtaining legal representations in the States of ConnecticutMassachusetts, and New York, still could not get any lawyer to agree to represent me.

11. That after the Cornel YOung's case in Providence, Rhopde Island, I was immediately turned down for representation, because most of the counsels approached told me, they do not want to be like the cornel Young's case, etc. this was very difficult for me, therefore, I Approached Moniz again, and he finally agreed to fully represent me.

12. That After Mr. Moniz agreed to represent me, He instead stated that in order to represent me, I have to get a Local Lawyer. I agreed to obtain a Local Lawyer, but to no avail. I have tried all of the time to obtained a counsel, but to no avail.

13, That after a year of looking for counsel to represent me locally, I approacehd Mr. Alton Wiley Jr. who agreed to represent me, only with an Experience Lawyer, who has done Wrongful Death cases, and who has represented clients against the city, Police et all.

14. That After Mr. Wiley Jr, agreed, I then approached Mr. Moniz and told him what Mr, Wiley Jr, has said, and mr Moniz and Mr Wiley Jr spoke and they both decided to represent me. as of June 04.

15. That if the Court agreed to not let Mr. Moniz represent me, I will be unfailry , represented, I will prejudiced, and the Law will unfairly and illegally treat me biasly, because I need a good representation in such a case that has two opinions about the death of my husband.

16. That I need to be represented by Mr. Moniz who has all of thimportant information, the experience and the expertise in representing client against a city and the City Police for Brutality, violence, unfair and mistreatment against minority, etc.

17. That I have made effort, in obtaining and through the effort of Ms Francis (Nellie) the following counsel to represent me against the City of Providence et all but to no avail, they have refused to represent me.::

1. Mr. Edward Sharpiro
2. Mr. Donald Woodbine
3. Mr. Robert Mann
4. Mr. David Cooper
5. Mr. David Cooper
6 Mr. Michael Bradely

18. ACLU OF RHODE ISLAND_PROVIDENCE

NOTE: ALL COUNSELS LISTED ARE RHODE ISLANDERS LAWYERS.

7Ms. Donna Ulhman
8.Mr. Jefferey Garabedian
9.Mr. Mike Felman
10. Mr.Cosby HARRISON, Harrison and Harrison Law firm
11.Mr. John Desimone
12. Mr, Ken Haupt
13. Mr. John Cicilline F,
14. Mr. Joseph Vocolla
15. Mr. John Harnett
16.Mr. Max Wistow
17. Mike De Feldman

NOTE: ALL OF THESE COUNSEL S WERE CONTACTED BY MY PRIVATE Assist and private Paralegal, Ms. Nellie S. Francis, who I have to assist me in obtaining Counsels to represent me.. Others on the list above were apporached by me along with Ms. Francis to have them represent me, but they all, after vigorous meetings, they refused to represent me.

Roseline N. Cholopy — RLVC 9413691 -
ROSELINE CHOLOPY
ADMINISTATRIX, ERIC KROMAH"S ESTATE
AND PLAINTIFF

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

SUBSCRIBED AND SWORN TO BEFORE ME IN PROVIDENCE, RHODE ISLAND ON THE_10th_DAY OF September, 2004

NOTARY PUBLIC
MY COMMISSION EXPIRES: 6/12/05

CERTIFICATION

I certifiy that I mail a truecopy of the within document on the of SEPTEMBER 2004 to the below person: ..

oseph Penza, JR.
enn & Penza, LLP
0 Greenwich Avenue
rwick, R.I. 02886

vin F. McHugh, Esq.
TY SOLICITOR'S OFFICE
Westminster Street, Suite 200
vidence, RI 02903-1845

(3) MR. JOSEPH MONIZ
100 ALLYN STREET
HARTFORD, CT. 06103

(4) Mr. Alton Wiley Jr.
960 Reservoir Ave
Suite 22
Cranston, RI
02910

RLVC 9413691 -

Roseline N. Cholopy
ROSELINE CHOLOPY
PLAINTIFF

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

Department of Health
OFFICE OF MEDICAL EXAMINERS
48 Orms Street
Providence, RI 02904-2284
(401) 222-5500
FAX (401) 222-5517

August 1, 2000

# PUBLIC RELEASE

The following information is being released by the Office of the State Medical Examiners:

Mr. Eric Kromah, a 35-year-old male of Providence, Rhode Island, expired on July 29, 2000, as a result of a sudden cardiac arrhythmia due to acute cocaine intoxication. This caused him to become unresponsive during police transport to the Roger Williams Medical Center. This transport was required for treatment of minor superficial injuries he had sustained during an alleged break-in.

Although pepper spray (Oleoresin Capsicum) had been applied during his apphrehension by police, the spray did not contribute to his death.

Elizabeth A. Laposata, M.D.
Chief Medical Examiner

EAL/cac